STEINBECK ET AL., APPELLEES, *v.* PHILIP STENGER SONS, INC., APPELLANT.

(No. C-74099—Decided January 20, 1975.)

*Messrs. Weber, Hensley & Nurre* and *Mr. W. David Bertsche, Jr.,* for appellees.

*Messrs. Carroll, Bunke & Henkel* and *Mr. Peter M. Rebold,* for appellant.

*Per Curiam.* This cause came on to be heard upon the appeal; the transcript of the docket; the journal entries and original papers from the Court of Common Pleas of Hamilton County; the transcript of the proceedings; the assignments of error; and the briefs and arguments of counsel.

In 1957, plaintiffs, the appellees herein, became the owners of a low-lying parcel of realty interdicted by two watercourses. Their land is a rectangular residential lot, the long axis of which runs 350 feet north to a mutual boundary with defendant's property. This latter realty consists generally of high ground rising to a plateau some

450 feet to the north. Prior to its purchase by defendant, the appellant, in 1972, it had been devoted exclusively to farming uses. The drainage of such high ground was then wholly natural, accomplished by surface waters diffusing through at least four watershed areas into four watercourses. Two of these ran from the plateau to the north and northwest. The remaining two drained from the plateau to the south, one entering plaintiffs' land from the northwest, the other passing through a third party's realty to enter plaintiffs' land from the northeast. These latter two watercourses, the diversion of which is the focus of this controversy, will hereinafter be referred to as the eastern and western draws.

In 1958, plaintiffs moved into their newly-constructed house, and by the end of the following year had improved the drainage of their property so as to accommodate and remove excess surface waters from both the eastern and western draws. Since the eastern draw was the predominant of the two, it was converted from an open watercourse to an enclosed 4 ft square box culvert. This culvert followed, precisely, the path of the original uncovered watercourse through its confluence with the minor western draw, discharging ultimately near the southwest corner of plaintiffs' property. The culvert was fitted with various inlets to receive the surface water, and in light of its capacity, sound construction and accurate placement served not only to eliminate runoff problems, but also permitted plaintiffs to use the northern portion of their lot without limitation.

In 1972, however, in consequence of defendant's purchase of the tract to the north, including 5.9 acres of high ground containing part of the plateau and the greater length of both the eastern and western draws, three altered sets of circumstances arose. Defendant, a housing developer, intended the 5.9 acres as part of a larger contiguous subdivision of roughly 24 acres. In order to facilitate construction, he altered the topography of the high ground, apparently obliterating the north-south ridge which had separated the eastern and western draws and steepening the grade leading to plaintiffs' property. Pre-

liminary discussions between plaintiffs and defendant as to the purchase and sale of an easement, whereby the high ground could be drained into plaintiffs' box culvert through the eastern draw, dissolved in mutual unpleasantness and were not resumed. Securing the approval of local governmental authorities, defendant ultimately constructed a storm sewer system for what was alleged to be 5.5 acres, wherein houses to be built at the head of the eastern draw were drained along a new street atop the plateau into pipes placed in the western draw. This combined and diverted runoff was then conducted underground to a point just short of the mutual boundary. The outlet at the discharge point is a pipe 18 inches in diameter, set in a large concrete headwall geographically sited on ground which, prior to topographical alteration, had been the western draw.

The gravamen of plaintiffs' Complaint concerned the effect upon their property of the diverted, increased and accelerated runoff disgorged by defendant's pipe. Throughout 1973, as construction continued and eleven of the sixteen houses planned for the original 5.9 acre tract were completed, the pipe shot water into the lower owner's backyard, inundating his garden, layering the lawn with mud, debris, rocks, and pollutants, and destroying flowers, vegetables and grass. In some instances, runoff by-passed the pipe with commensurate deposits of assorted effluvia passing directly onto the lower owner's land. In consequence of the cumulative and continuing effect of defendant's use of the higher ground, this action was brought for damages and injunctive relief. After a trial by jury, the lower owner was awarded $7,000 compensatory and $10,000 punitive damages. The court, sitting in equity, then ordered the purchase and sale of an easement to allow for the construction of an underground link between defendant's pipe and plaintiffs' culvert, with $1,800 awarded plaintiffs to accomplish the same.

I.

Defendant presents six assignments of error, the first asserting that the trial court erred in overruling its

motions for a directed verdict made both at the close of plaintiffs' case and renewed at the close of all evidence. Defendant relies heavily upon the case of *Munn* v. *Horvitz Co.* (1964), 175 Ohio St. 521, urging us in substance to accept the following syllogism:

The law of *Munn*[1] frees the upper landowner from liability to the lower owner for injury to the latter from an increase in volume and acceleration of the flow of surface waters caused by artificial conditions (such as result from the construction of a subdivision of guttered homes, conversion from grassed areas to blacktop or concrete surfaces, etc.), so long as the surface waters are collected within and *from its own property* from watersheds naturally exhausted onto appellees' property, and the discharge point for the increased and accelerated flow is a natural watercourse within, originating on or passing through, the upper owner's property and;

The evidence before the trial court placed appellant and appellees in precisely the same situation, in all material respects, as in the *Munn* case.

Therefore, appellant concludes, since reasonable minds could come to but one conclusion with respect to the foregoing premises, appellant was entitled to a directed verdict, which the court erred in not granting.

Because of the complexity of the questions underlying this argument, it may be useful to briefly sketch the fun-

---

[1] "(1) An upstream municipality may collect, by means of sewers, the surface water from a watershed area within the corporate limits and channel it into a natural watercourse which originates in or passes through *such watershed area* within the municipality, thus increasing the volume and accelerating the flow of water in the watercourse, without incurring liability to the downstream municipalities or landowners. (*Mason* v. *Commissioners of Fulton County* [1909], 80 Ohio St. 151, approved and applied.)" (Emphasis added.)

"(4) A prescriptive right to divert surface water from one watershed, or a portion thereof, to another is not limited to the quantity of water originally so diverted but rather includes all the surface water which may run off such foreign watershed through reasonable use of such land by a municipality or the inhabitants of such land." (Syllabus.)

damental theories of surface water law arguably applicable to the instant case. First is the so-called civil-law rule, traditionally applied to rural areas, although also found to some degree, as in *Munn,* in municipal corporation cases. In its strict application, the civil-law rule requires the upper owner to leave his land in a purely natural condition and the lower owner to accept, without redress, whatever surface waters flow therefrom. A modification of this rule allows artificial drainage by the upper owner to enhance the practice of agricultural pursuits, subject to the *Munn* qualifications (paragraph one of the syllabus), and subject to certain rights in the lower owner who may suffer therefrom. *Martin* v. *Jett* (1838), 12 La. 501; *Butler* v. *Peck* (1865), 16 Ohio St. 334; 55 Ohio Jurisprudence 2d 233, *Waters and Watercourses,* Section 55. As to urban lands, however, it has been widely stated that "surface water is a common enemy in a city," and the Supreme Court of Ohio has held that "the owner of private lots can raise the same to grade if he so desires, and can thus keep out all surface water * * *." *Springfield* v. *Spence* (1883), 39 Ohio St. 665, 671. This common-law, or "common-enemy," rule would appear to be the basis for relief only in urban areas (*Johnson* v. *Goodview Homes-1, Inc.* [1960], 82 Ohio Law Abs. 526) with its civil-law counterpart prevailing in unincorporated rural areas, *Mason* v. *Commissioners* (1909), 80 Ohio St. 151. Yet, any thought of a strict dichotomy of authority along these lines must give way to reality, which shows the distinction blurred by a number of exceptions engrafted onto the rule.

One of the most notable of these is the "reasonable use" doctrine, adopted in this appellate district in *Strohm* v. *Molter* (1939), 30 Ohio Law Abs. 330, where it was applied to urban areas, and again enunciated in *Ratcliffe* v. *Indian Hill Acres* (1952), 93 Ohio App. 231, where it was applied to a combined surface waters-riparian rights question in an area composed predominantly of large rural estates.

*Munn* v. *Horvitz, supra,* involved in part the acquisition by a municipal corporation of a pre-emptive right to

divert surface water from one watershed to another, and in part the question answered by paragraph one of the syllabus. (See note 1.) To the extent that the case requires the rule of reasonable use regardless of locality (*Munn* v. *Horvitz*, at 528), and in light of its apparent application to municipalities of the civil-law rule designed for use in rural areas,[2] we are left with little certainty of any continuing utility in the civil-law common-law distinction.[3]

Be that as it may, it is clear to us that defendant misapprehends what it conceives to be the controlling effect of *Munn* on the case at issue. Defendant assumes that *Munn* stands as authority for its right to collect, increase in volume and acceleration, and discharge without liability all tributary surface waters onto the property of plaintiff, so long as such waters derive solely from its own dominant property and so long as it discharges such waters into a natural watercourse originating on or passing through such property. Under this theory, defendant would hold it immaterial that it diverted surface waters from one watershed to another, so long as both watersheds were located on its own property and exhausted ultimately onto plaintiffs' property, and the waters so diverted and collected were discharged from its property into a watercourse draining

---

[2] The rationale supportive of the *Munn* syllabus is articulated in broad enough terms that we do not take the case to be *sui generis*; i. e., that it is peculiar to a municipality's right to artificial drainage and therefore distinguishable from the instant appeal.

[3] That the exclusivity of the traditional urban-rural distinction may be honored more in the breach than the observance is suggested by a comparison of secondary authorities and cases cited therein, e. g., 27 West's Ohio Digest at 235-38 (1950); 55 Ohio Jurisprudence 2d 228, Waters and Watercourses, Sections 50-58; Annot., 59 ALR 2d 421 (1958); 40 A Vale Pa. Digest at 287-303 (1971). *See also City of Hamilton* v. *Ashbrook* (1900), 62 Ohio St. 511; *Columbus* v. *Farm Bureau Coop. Assn.* (1971), 27 Ohio App. 2d 197; *Johnston* v. *Miller* (1968), 15 Ohio App. 2d 233; *Spicer* v. *White Bros. Builders, Inc.* (1962), 118 Ohio App. 11; *Day* v. *Mummey* (1963), 200 N. E. 2d 785 (Common Pleas); *Boettler* v. *Township Trustees* (1960), 12 Ohio Op. 2d 276; *Spielberger* v. *Twelfth Dayton Builders Corp.* (Common Pleas 1956), 76 Ohio Law Abs. 12; *Rau* v. *Wilden Acres* (1954), 376 Pa. 493, 103 A. 2d 422.

one of such watersheds. More pointedly defendant argues that such diversion is no diversion at all. We do not so read *Munn* which, while carefully holding that the dominant owner may channel waters collected in a watershed area "into a natural watercourse which originates or passes through *such watershed area*," further narrowly holds that if the owner seeks to divert waters collected from other or "foreign" watershed areas and discharge them into that same watercourse, it may do so without liability provided it has acquired a prescriptive right to drain the entirety of such areas, but not otherwise.

Applying this rationale to the instant case, the facts reveal that the increased surface waters which would naturally have been diffused through the eastern draw are now, by virtue of defendants' altered topography and artificial drainage connecting that watercourse to the western draw, discharged through the headwall and pipe at the foot of said western watercourse. Thus, the watercourse draining the eastern watershed has been diverted and fed into the watercourse draining the western watershed, increasing the volume and intensity of the western flow beyond that which a reasonable use of the western watershed area alone would have entailed. Moreover, the evidence reveals that yet another diversion was effectuated in the instant appeal; namely, in reconfiguring the terrain to suit its house-building activities, defendant has brought into the western draw an appreciable land area which formerly and naturally drained its surface waters into a third watercourse to the northwest. *Id.* This second diversion is in no way permitted even under defendant's interpretation of *Munn,* and the ameliorating argument that defendant in fact decreased the total "area" draining across plaintiffs' land fails to offset the fact that a patently prohibited diversion of a non-tributary water-course occurred. R. C. 3767.-13.

As to the ultimately tributary eastern and western draws, part of defendant's misunderstanding may arise from the perspective with which one views a watershed. From the point of view of the upper owner, the entire

area draining ultimately across plaintiffs' land might be viewed as a single watershed area, but from plaintiffs' point of view, since the eastern and western draws enter their land at different points, the area drained clearly consists of not one but two distinct watersheds. Thus, defendant's insistance that it is entitled by the authority of *Munn* to artificially drain the entire area of *its* watershed would be persuasive only if the western and eastern draws had a natural juncture on defendant's land. Since their point of confluence is in fact well within plaintiffs' boundary, defendant's contention that it was entitled to a directed verdict is wholly without merit. Both premises of the syllogism are faulty and the first assignment of error is accordingly overruled.

We have indicated *supra* that had the two draws naturally joined above plaintiffs' boundary, the rule of *Munn*, as we understand it, would compel a result opposite from that we have reached. It seems appropriate to comment, parenthetically, that the combined effect of the "reasonable use" and "area" concepts, as defendant concedes, might be argued to permit an almost *reductio ad absurdum* exploitation of the dominant property, *e. g.*, blacktopping the entire land mass for parking to serve a supermarket, and funnelling the runoff into plaintiffs' backyard, all without liability whether or not it washed plaintiffs' house away in the process. Since the area involved is unincorporated, recourse by the lower owner to remedies allowed by the traditional common-law rule is, presumptively, prohibited—even though the evidence shows the housing density characteristics of the area to be overwhelmingly suburban. This latter consideration would seem to militate strongly against an application of the modified civil-law rule, which developed out of purely rural agricultural concerns. Although factual happenstance relieves the instant case from the direct problem, it would appear that the absence of a clear rule of law for surface waters in suburban or urbanizing, but unincorporated, areas presents a situation which could lead at best to inconsistent or inharmonious results achieved on a case-by-case basis, and at worst

to intolerable burdens placed upon lower land owners.

## II.

Defendant's second assignment of error asserts that the court erred in refusing to charge the jury as follows:

"If a lower landowner changes or alters a natural watercourse upon his land, or places structures or improvements on his land, which check or stop the normal flow of water from upper lands on the watercourse, causing it to overflow its course and spread over his land, he (cannot complain of damages resulting to him from his own act.) (has no right to recover damages from an upper landowner who lawfully discharges surface waters into the watercourse.)"

Here the facts show that the damage to plaintiffs' property was caused partly by the inadequacy of defendant's drainage system itself, and primarily by the defendant's diversion of runoff from the eastern watershed area to the western. Plaintiffs' prior conversion of the eastern watercourse from an uncovered draw to a box culvert in no way *caused* an overflow or any discernible part of the damage, particularly where the injury done them resulted in the main from defendant's activities vis a vis the western draw.

Accordingly, where the record, as here, reveals facts which expressly negate an essential element of a requested instruction, we hold there is no error in the trial court's refusal to give such a charge. Defendant's second assignment of error is overruled.

## III.

Defendant next assigns as error that the court erred in submitting the issue of punitive damages to the jury, arguing that defendant's wrongdoing, if any, did not constitute actual malice; that malice and punitive damages should not have been included in the charge because they were not pleaded; that the instructions were improper because they were insufficiently detailed; and that the charge was erroneous because it assumed a fact in dispute. The charge as given, in pertinent part, was as follows:

"If you find for the plaintiffs and award them actual or compensatory damages, then you may also consider whether you will separately award the plaintiffs punitive damages. If you do not find actual or compensatory damages—and I use the words "actual" and "compensatory" interchangeable—if you do not find actual or compensatory damages, you cannot consider punitive damages.

"Punitive damage is an amount which a jury may but is not required to award as a punishment to discourage others from committing similar wrongful acts. Punitive damage may be awarded only where a party intentionally and with actual malice and without lawful justification or excuse injures or damages another.

"Actual malice means anger, hatred, ill will, hostility against another, or a spirit of revenge.

"If you award punitive damages, the amount should be fair and reasonable under all the facts and circumstances. It should not be excessive or actuated by passion or prejudice. The amount of punitive damage rests in the sound judgment of the jury and should be determined from all the evidence in the case.

"In respect to your consideration of whether or not to award punitive damages, since malice is an essential element of punitive damages, you may take into consideration the engineering advice solicited and received by officers of the defendant company. In other words, the fact that the defendant company through its officers consulted an engineer and acted on his advice may be considered with respect to the subject of a punitive damage award."

It is plain from a comparison of the above language to defendant's arguments that no fact in dispute was assurred by the charge, and that the charge was given in adequate detail. As to the argument that the issue should not have been given to the jury because it was not pleaded, we note that Civil Rule 15(B), which allows the amendment of pleadings to conform to the evidence, expressly recites that "[f]ailure to amend as provided herein does not affect the result of the trial of these issues." A corollary of the rule that it is error for a judge to submit to a jury

a question of fact that does not arise from the evidence (*Cincinnati Traction Co.* v. *Forrest* (1905), 73 Ohio St. 1) is the absence of error where a charge is predicated upon facts in evidence. Where such facts support an issue not pleaded but contemplated by and amenable to the provisions of Rule 15(B), it is not error for the court to charge accordingly.

Defendant's most persuasive argument under this assignment of error raises the question of whether the record contained sufficient evidence on the issue of malice to require a jury determination. Here, a careful examination of the record shows evidence from which reasonable minds might well have conceded that defendant's deliberate and knowing construction of a storm drainage system inclusive of substantially altered terrain, attended by a potential and foreseeable hazard to plaintiffs' land while under construction, and, following unsuccessful and ultimately bitter negotiations, situated so as to discharge a greatly increased volume of water just short of plaintiffs' boundary, was motivated either by malice in fact, or marked by a sufficient and reckless disregard for the consequences as to constitute inferrible malice. *Cf. Davis* v. *Tunison* (1959), 168 Ohio St. 471; *Barber* v. *Schell Leather Goods, Inc.*, unreported, First District Court of Appeals, 1972.

In consideration of such evidence raising and supporting the issue of malice, we hold it was neither error for the court to charge on punitive damages, nor manifestly against the weight of the evidence for the jury to award them. Defendant's third assignment of error is accordingly overruled.

## IV.

Defendant's fourth assignment of error asserts that the court erred in submitting the issue of compensatory damages to the jury, and further asserts error in the admission of incompetent evidence as to the diminution in value of appellees' property. The record is replete with evidence showing direct injury to the lower owner's realty. Moreover, the record contains evidence showing that plaintiffs' in consequence of such injury, were denied the use

and enjoyment of the land affected thereby. The trial court's instruction to the jury reveals that compensatory damages were properly predicated upon the following: those damages incurred during the progress of defendant's construction work by virtue of the discharge onto plaintiffs' land of mud, silt, debris, or pollutants, and those damages suffered in the loss of use or enjoyment of plaintiffs' property because of the trespass inherent in water flowing upon such land in areas and/or quantities where it did not previously flow, in consequence of the diversion previously discussed. We find no error in the court's instructions.

Defendant's theory that damages were predicated upon incompetent diminution-in-value evidence, 16 Ohio Jurprudence 2d 227, Damages, Section 196, is factually inappropriate since the court did not submit the issue of diminution in value to the jury. Any error committed in admitting such evidence was not prejudicial. Furthermore, since defendant did not object to the court's charge on compensatory damages, any arguable error therein was waived. The fourth assignment of error is without merit and overruled.

## V.

Defendant's final assignments of error assert that the judgment was against the manifest weight of the evidence and was contrary to law. No additional argument is advanced in support of these overbroad assignments, the defendant instead expressly relying upon the substance of his appeal as presented in his prior assignments of error. Inasmuch as we have thoroughly examined those issues critical to this appeal in our disposition of the prior assignments and have found no prejudicial error therein, assignments of error five and six are overruled and the judgment is affirmed.

*Judgment affirmed.*

HESS, P. J., SHANNON and PALMER, JJ., concur.