PAUL *v.* THE FIRST NATIONAL BANK OF CINCINNATI ET AL.

(No. A-743096—Decided November 18, 1976.)

Common Pleas Court of Hamilton County.

Mr. C. R. Beirne, for plaintiff.
Mr. R. O. Klausmeyer, for defendants.

BLACK, J. As the purchaser for $575,000 of an elegant residence known as Long Acres, located in Indian Hill, Hamilton County, plaintiff Lawrence M. Paul sues the defendants (1) for removing and converting from the buildings and grounds certain items of property, (2) for damages resulting from failure to maintain the estate prior to delivery of possession as required by the purchase contract, and (3) for punitive damages.

The following description from a sales brochure published and distributed by a real estate agent under contract with defendant The First National Bank of Cincinnati, as Executor of the Estate of Augustine J. Long, deceased, indicates the style and character of this transaction:

"'Long Acres' is an estate of picturesque charm, styled after the stately manors of England during the Tudor period. Surrounding the 17-room stone house are 97 acres of beautiful, gently rolling terraces exquisitely landscaped to compliment the natural terrain. Although elegant in every manner, Long Acres is a marvelous family home.

"Magnificent carved doors welcome you into the main entrance or 'Great Hall,' with its vaulted ceiling, medieval chandelier and stone stairways that wind majestically to the balcony. From either side of the Great Hall huge, hand-rubbed maple archways lead to the living quarters. To the left is the Elizabethan music living room, also with vaulted ceiling, marble fireplace and a pipe organ. Throughout the first floor there are pictorial, leaded glass windows."

On July 13, 1971, plaintiff entered into a purchase

contract with the defendant Executor, which contained the following provisions, among others:

"1. *Purchase and Sale of Real Estate.* The Bank agrees to sell and Paul agrees to purchase certain residential real estate situated in the Village of Indian Hill, Hamilton County, Ohio, more particularly described on Exhibit 'A' attached hereto and made a part hereof, *improvements, fixtures, and appurtenances* being also described on Exhibit 'A', all of which is herein referred to as 'The Real Estate.' " (Emphasis added.)

Exhibit "A" contains the following two paragraphs in addition to the metes and bounds description of the real estate:

"*II.* Together with all of *electrical,* plumbing, heating and bathroom *fixtures,* all window and door shades, venetian blinds, awnings, curtain rods, window and door screens, storm windows and storm doors, affixed wall mirrors, drapery rods, attached linoleum, wall to wall carpeting, stair carpeting, *built-in ranges and ovens,* built-in refrigerators and dishwashers, landscaping, shrubbery, attached television aerials and *all fixtures relating to said real estate,* except the Viking Lamp over the billiard table, which, if removed, shall be replaced with a fixture of suitable size and quality at the expense of Sellers.

"*III.* Mr. and Mrs. Donald J. Hogan may continue to occupy the main residence for a period of Ninety (90) days beyond the date of conveyance of title without payment of any rent upon the following conditions:

"(1) Agreement that upon proper notice prospective purchasers may inspect the premises; and

"(2) payment of *all maintenance costs,* including charges for heat, electricity, water and insurance, as well as a prorata share of real estate taxes attributable to the residence so occupied." (Emphasis added.)

On October 14, 1971, this transaction was closed by payment of the purchase price in exchange for deed to the property. Possession was not delivered until January 15, 1972, under the terms of the contract, because Mrs. Hogan (a daughter of decedent and one of the defendants herein)

was pregnant and expecting a child; out of consideration for Mrs. Hogan, plaintiff had acceded to a request that the Hogans be permitted to continue their occupancy for 90 days without payment of rent.

When possession was delivered to plaintiff on January 15, 1972, he noticed that a number of items were missing that had been on the property both before and after the date of the purchase contract. The defendants admit that these items had been removed by the individual defendants before surrendering possession.

Decedent Augustine J. Long, his wife and one of his children died on September 9, 1969, in an airplane accident. Mr. and Mrs. Hogan moved into Long Acres about 20 days later, in order to maintain it and to keep it presentable for sale. The First National Bank of Cincinnati was duly appointed Executor of the Long Estate.

The will left to the decedent's surviving children *"all household furnishings, appliances, decoration and equipment* owned by me and used in or about any principal or seasonal residence." (Emphasis added.) The real estate passed as part of the residue to The First National Bank of Cincinnati, as trustee under a 1969 Trust Agreement with the decedent. The four surviving children divided up the personal property among themselves as the result of three meetings, the first of which was held in January 1970, and the last of which was held in October or November 1971 (presumably after the closing of the sale). Each of the children now has one or more of the several items claimed by plaintiff to have been wrongfully removed and converted.

The case was tried to the court without a jury in a series of hearings.

## DECISION

I. The plaintiff is entitled to recover the following amounts from defendants Nancy L. Hogan, Dorothy L. Ward, Patricia L. Bonn and William A. Long, jointly and severally:

(A) For conversion of property:

| | |
|---|---:|
| 4 Handmade lighting fixtures around swimming pool | $1,000 |
| Lighting fixture in living quarters of apartment over stable | 100 |
| 2 Lighting fixtures removed from chapel | 125 |
| Stair carpeting | 0 |
| 3 Metal cranes | 4,650 |
| Ornamental housing over well | 2,100 |
| Mercury statue | 800 |
| Range and oven | 0 |
| 4 Garden Statues | 500 |
| Walnut organ bench | 400 |
| **Subtotal** | **$9,675** |

(B) For punitive damages and attorney fees:

| | |
|---|---:|
| Punitive damages | $3,000 |
| Attorneys fees | 3,000 |
| **Subtotal** | **$6,000** |
| **TOTAL** | **$15,675** |

II. Plaintiff is entitled to recover the following amounts from defendant The First National Bank of Cincinnati, as Executor:

(A) For failure to replace:

| | |
|---|---:|
| Viking light fixture | $3,000 |

(B) For failure to maintain:

| | |
|---|---:|
| Damage to blue spruce | $1,200 |
| Damage to cutting bed (known as "rose bed") | 2,000 |
| Damage to fence of riding ring | 0 |
| Damage to ceiling over organ | 0 |
| **TOTAL** | **$6,200** |

III. Interest on the foregoing amounts will run at the legal rate from January 15, 1972, with the exception of punitive damages and attorney fees [I(B) above], with re-

spect to which interest runs only from date of judgment entry.

## REASONING

### General

The court concludes that the pertinent contract (sometimes known as the $410,000 contract) was proved and is now before the court for interpretation.

### I(A)

The converted items must be considered in two groups, as follows:

(1) 4 Handmade lighting fixtures around swimming pool
Lighting fixture in living quarters of apartment over stable
2 Lighting fixtures removed from chapel
3 Metal cranes
4 Garden statues.

(2) Ornamental housing over well
Mercury statue
Walnut organ bench

In the court's judgment, group (1) are legally classified as "fixtures," and group (2) are "appurtenances," under the intent and meaning of the purchase contract. This conclusion is based on three considerations: the law of fixtures, the intent and meaning of the purchase contract, and the intent and meaning of the testamentary gift to the children.

Under the terms of the will the Long children were given "all household furnishings, appliances, decorations and equipment." These items are disposed of before the real estate "passes" to the Executor as a part of the residue. The Executor can sell only what is left after this bequest to the children. They were not given all the decedent's tangible personal property; only the listed items. A reasonable interpretation of the will leads this court to the conclusion that none of the items in groups (1) or (2) passed to the children by the will. Only the "stair carpet-

ing" and the stove passed to them. The details of this reasoning will become apparent in the succeeding paragraphs.

In *Masheter* v. *Boehm* (1974), 37 Ohio St. 2d 68, the Supreme Court designated, in paragraph two of the syllabus, six "facts" to be considered in determining whether an item is a fixture:

(1) The nature of the property;

(2) The manner in which the property is annexed to the realty;

(3) The purpose for which the annexation is made;

(4) The intention of the annexing party to make the property a part of the realty;

(5) The degree of difficulty and extent of any loss involved in removing the property from the realty; and

(6) The damage to the severed property which such removal would cause.

As the Supreme Court ruled, the expression of "a comprehensive and generally applicable rule of law" about fixtures has bedevilled the courts for years and is complicated by the need for different definitions in those situations where the relationship between the parties is different. That case dealt with eminent domain (what comprises the "real estate" which was appropriated?), while the instant case deals with a buyer and a seller, and the distributees under a will. Nevertheless, the six considerations listed in *Masheter* v. *Boehm, supra,* are pertinent, and applicable in the interpretation of "all fixtures relating to said real estate" in paragraph II of Exhibit "A" of the purchase contract.

Using the Supreme Court's considerations, the light "fixtures" (there is no other available word) from the swimming pool, the stable apartment and the chapel are clearly fixtures in contemplation of law. They meet the primitive tests of *Teaff* v. *Hewitt* (1853), 1 Ohio St. 511. They are of a type universally recognized as fixtures. This is true even though the pool "fixtures" were hung on brackets and could be unplugged and simply lifted off the brackets. But they were designed and produced solely and only for the swim-

ming pool, from the same design as was used for the light fixture in the porte cochere (which was not removed). Further, the poles from which they were taken are barren and incomplete without them.

The three metal cranes and the four garden statues also meet five of the six criteria, in the judgment of the court. The "nature" of these items is that they were a part of the total elegance of Long Acres. They are not the type of fixture which would be commonly found on other lawns or in other gardens in Hamilton County, but they are an integral part of this sumptuous country estate. The cranes were "annexed" by being bolted or screwed into concrete foundations in a manner similar to the annexation of the marble table in the Great Hall, an item clearly admitted by all defendants to be a fixture passing with the real estate. The 4 garden statues (busts?) were not simply placed on top of their columns, but were held in place by 6-inch pipe protruding from the columns into the bases of the statues. The purpose of fixing these into position was to ensure their presence and preservation as part and parcel of the landscape and approach to Long Acres. These cranes and statues were not items moved about at the whim of the owner or according to the seasons: they were permanent implacements, intended to be part of the continuing visual effect of the estate. While no great difficulty was encountered in removing any of them, their absence is a source of loss. The cranes were prominent in the approach to the front door, and that approach is damaged without them. They are shown in several photographs attached to the appraisal which was prepared by the Cincinnati Real Estate Board and considered by plaintiff before entering into the purchase contract. The removal of the statues leaves the columns on which they stood barren and incomplete; the columns appear to have been vandalized.

Group (2), being the ornamental well housing, the Mercury statue and the organ bench, were not attached in a permanent way. However, interpreting the contract from its four corners, in the light of all the facts and circumstances in evidence, the Court concludes that these items

were "appurtenances" to the real estate, both in contemplation of law and in interpretation of this word as used in the purchase contract.

The word "appurtenance" means more than rights of way or other incorporeal rights: it includes an article adapted to the use of the property to which it is connected and which is intended to be a permanent accession to the freehold. *Szilagy v. Taylor*, 63 Ohio App. 105 (1939); *Black's Law Dictionary* (Revised 4th Ed.), page 133.

All three items in group (2) form a part of the character of Long Acres and enhance the style of its elegance. They are appurtenant to Long Acres in the sense that they are necessarily connected with the use and enjoyment of this country estate. They are incidental to the total value of this estate. The source of that value is not only the grand design but also all of the details whereby that design is executed: the location of the house on the property, the sweep of the driveway as it approaches the porte cochere, the spread-out location of the barns and other outbuildings, the majesty of the formal gardens, the spaciousness of the lawns on every side, and all the details of the exterior and interior of the mansion itself.

To allow the heirs to walk off with an organ bench, leaving the built-in organ behind would be plainly ridiculous. You cannot play an organ while standing up, and no ordinary bench will do.

The Mercury statue is pictured in two photographs included in the appraisal of Long Acres which was considered by plaintiff before purchase. It may have been moved from the pedestal from time to time by the Long family, and it was not a "sun dial," despite this label in the appraisal. But interpreting the contract in the light of all facts and circumstances in evidence, the Court concludes that these items were appurtenances passing with the real estate.

The stove was not "built-in." It was surrounded by cabinets and an overhead fan and shield. But it could be pulled out from that location, it is a replaceable item, it is an "appliance" under the terms of the will, and it was

listed as a chattel in the probate inventory and so disposed of in settling the probate estate.

The term "stair carpeting" is a misnomer. This was a small oriental rug of a size commonly called a "throw rug." It was tacked down to the short set of stairs from the Great Hall to the music room, but that was to keep it from slipping and causing injury. It was a floor rug adapted to this location on what the court considers a temporary basis. It was a "furnishing" which was given to the children by the will; and it was listed as a chattel in the probate inventory and was so disposed of in settling the probate estate.

## I(B)

Punitive damages are awarded against the Long children with respect to the wrongful removal and conversion of the items comprising group (1), the amount being appropriate to the degree of malice in the judgment of the Court. The amount of attorney fees awarded to plaintiff is that proportional part of the total ($7,482.50) which is attributable to the damages arising from conversion of group (1), or 40 per cent of the aggregate award against all defendants. "In Ohio it is settled that in those tort actions where attorneys' fees may be recovered, the fees are not awarded as part of the exemplary or punitive damages, but as compensatory damages, which the jury may in its discretion allow." 16 Ohio Jurisprudence 2d Rev. 142, Damages, Section 119. *Gates* v. *Toledo* (1897), 57 Ohio St. 105, at 112, *Davis* v. *Tunison* (1959), 168 Ohio St. 471.

The distinction which must be made here is between stubbornness in asserting a claim of doubtful validity on the one hand, and on the other, wanton or reckless disregard of the rights of the purchaser. With respect to the "appurtenances," designated group (2) above, the dispute about their status in law is reasonable. The mere assertion of right by the purchaser with respect to these items does not require the legatees to capitulate: the issue is justiciable.

However, the Long children plainly had no right to cut down and remove light fixtures, or to remove and refuse to return the other items comprising group (1). The status of these items is not and was not in doubt, in the judgment

of this Court, and the taking was accomplished with knowledge (both actual and constructive) of the legal status of the items, with purpose to deprive the purchaser of them permanently, without a reasonable or lawful excuse, and to the purchaser's injury.

These defendants had every opportunity to consult in detail with the Executor and their attorney, and also with the purchaser, before they removed these fixtures. They did not do so. Instead, in wanton disregard of the rights of others, they began dividing up the property 18 months before the real estate was sold, and they kept their intentions hidden from both the Executor and the purchaser. They misled the purchaser by leaving these fixtures in place until just before delivery of possession. All of the subsequent dealings between the lawyers, the Executor and these individuals tend to confirm the wrongfulness of the original taking and the culpable mental state with which it was accomplished.

While there is no direct evidence of malice (in the form of personal hate or ill will) in this case, this element of plaintiff's case is inferred from defendants' conduct. Imputed malice is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." 16 Ohio Jurisprudence 2d Rev. 184, Damages, Section 161. *Sarbinsky* v. *Henry H. Krause Co.* (C. A. 6, 1967), 378 F. 2d 656. *Steinbeck* v. *Philip Stenger Sons* (1975), 46 Ohio App. 2d 22, at page 32. See also, *Davis* v. *Tunison* (1959), 168 Ohio St. 471, and *Smith* v. *Transamerican Freight Lines, Inc.* (1943), 72 Ohio App. 239.

Punitive damages can be awarded in an action for conversion where the proof shows fraud, malice, insult or wanton or reckless disregard of the legal rights of others. *Davis* v. *Tunison, supra*; *Armstrong* v. *Feldhaus* (1950), 87 Ohio App. 75; 54 A. L. R. 2d 1361, Annotation. "Punitive or exemplary damages for conversion of personalty by one other than chattel mortgagee or conditional seller."

## II(A)

The contract plainly calls for replacement of the Viking

lamp "with a fixture of suitable size and quality" and this is the obligation of the Executor, as seller under the contract. Plaintiff has not at any time waived his right to enforce this provision of the contract. The court finds that the replacement cost is $3,000.

## II(B)

Another of the Executor's obligations under the contract, considering it from all of its four corners, was to maintain the entire estate in a reasonably appropriate fashion from the date of the contract to the day of delivery of possession. The court finds that the Executor failed to perform, resulting in the loss of one blue spruce and the entire cutting bed (rose bed); the Court concludes that the Executor must pay for the damages thereby incurred. It is noted that after Mr. Long's death, the amount of landscape maintenance was reduced from $9,000 per year to about $3,000 per year, and that the Executor had knowledge (actual or constructive) of the prospective causes of the loss of the blue spruce and the cutting bed, and ample opportunity to save them, but that the Executor failed to do so.

There is insufficient evidence to persuade this Court that it was the Executor's lack of maintenance that was the cause for the deterioration of the riding ring fence or the leak in the ceiling above the organ. The Court is not persuaded that these deficiencies arose during the time of the Executor's responsibility, or that they were caused by other than ordinary wear and tear.

## MEASURE OF DAMAGES

The conclusion of the court is that with respect to the conversion of property (Count 1), damages shall be the fair market value of replacement articles (determined as of the day of taking); the principle is to restore plaintiff fairly and reasonably to his position before the wrongful taking of these articles.

It makes no difference whether these damages are considered (1) those arising from wrongful injury to real estate or (2) those arising from conversion to defendants' use of chattels [either wrongfully detached and removed from the

real estate ("fixtures") or wrongfully removed, even though not detached because not physically attached in the first instance ("appurtenances")].

As fixtures [group (1)] and appurtenances [group (2)], these articles are classified legally as items which pass to the purchaser on sale of the real estate. While injury to real estate is normally measured by the before-and-after test, or the with-and-without test, that measure of damages is not inflexible. The overriding principle is to compensate the injured party fully for the losses proximately caused by defendants' wrong. Therefore, an exception has been recognized with respect to items reasonably essential to the planned use of the property for a homesite in accordance with the tastes and wishes of the owner, and the owner has recovered the fair cost of restoring his property to a fair approximation of its former condition, without reference to the discrimination in market value of the land. *Thatcher* v. *Lane Construction Co.* (1970), 21 Ohio App. 2d 41, noted in Later Case Service Annotation in 69 A. L. R. 2d 1335, Supplement dated April 1976 at p. 220. Proof of the fair market value of the replacement trees was held to be sufficient to support the Court's finding on damages.

On the other hand, these articles [both group (1) and group (2)] can be considered personal property or chattels because it was by defendants' initiative and action that they were detached and removed or simply removed. If they are classified as chattels, defendants cannot be heard to object because defendants changed their status from real property to personal property. When these are classified as chattels permanently converted by defendants to their own use, the measure of damages is the value of this personal property at the time of taking, with interest from the time of conversion. 11 Ohio Jurisprudence 2d 634, Conversion, Section 60 through Section 63.

Briefly, the measure of damages in a case of this nature is and should be the same however the articles may be classified in law. The overriding principle is full compensation for loss wrongfully caused. Semantics and subtlety of language must not subvert that principle.

The court is not persuaded that plaintiff is entitled to recover either (a) the value at time of the wrong, or (b) the value at time of the trial (judgment), whichever is greater. This rule does not appear to be adopted in Ohio and it is not a majority rule among the states. Annotation, "Allowance as damages for conversion of commodities or chattels of fluctuating value, of increase in value after the time of conversion," 40 A. L. R. 1282, supplemented in 87 A. L. R. 817. Restatement of Torts, Section 927, Comment e. Both authorities suggest that this measure of damages has been and should be limited to those chattels (shares of stock, marketed commodities and similar items) subject to constant daily fluctuations in value.

*Judgment accordingly.*

## SUPPLEMENTAL DECISION

### (Decided December 21, 1976.)

BLACK, J. Subsequent to the Decision (November 18, 1976), plaintiff raised the question of the liability of defendant The First National Bank of Cincinnati, as Executor of the estate of Augustine J. Long, deceased, for breach of contract in failing to deliver to plaintiff as purchaser those items of property which were converted by the four individual defendants. In other words, why is the Executor not liable to the purchaser for breach of contract arising by reason of failure to deliver the items listed in paragraph I(A) [on page 4] of the Decision, in the aggregate amount of $9,675?

The Executor opposes this additional award of judgment on the grounds that since there was an equitable conversion upon execution of the contract for sale of the real estate, the plaintiff had equitable title and the property was taken from him by the four individual defendants, and that third parties made it impossible for the Executor to perform.

The plaintiff is entitled to recover the sum of $9,675 (with interest at the legal rate from January 15, 1972) from

The First National Bank of Cincinnati, as Executor, for breach of contract, in addition to the sums awarded to plaintiff from said defendant and noted in paragraphs II and III [page 87] of the Decision.

## REASONING

The defense of equitable conversion (that the Executor cannot be held responsible because the individual defendants converted the items from the equitable ownership of the purchaser) has no legal significance. The purchaser did not obtain the right to possession until January 15, 1972, and by that time all those items had been removed from the property. That action gave rise to the tort, but it has nothing whatsoever to do with breach of contract.

That tortious removal by the individual defendants may very well settle the ultimate liability as between the Executor and the individual defendants, but the issue of contribution or reimbursement is not before the Court at this time, there being no cross claims in this case.

Ohio follows the strict general rule with respect to impossibility of performance of a contract, to the effect that supervening impossibility of performance of a contractual obligation does not excuse the promissor from his duty to perform his promise where the contract failed to provide for such contingency, even though the impossibility developed without fault of the promissor. *Morris Coal Co. v. Thompson* (1914), 2 Ohio App. 345, *The London & Lancashire Indemnity Co. v. Bd. of Commissioners* (1923), 107 Ohio St. 51.

According to 6 Williston On Contracts (Rev. Ed.), Section 1931, and Annotation, "Modern status of the rules regarding impossibility of performance as defense in action for breach of contract," 84 A. L. R. 2d 12, Section 2, the strict general rule goes back to 1647 and the case of *Paradine v. Jane*, 82 Eng. Rep. 897. It is formulated as follows: "But when the party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity; because he might have provided against it by his contract." Williston, *supra*, at page 5407.

The harshness of that old rule has been ameliorated

over the centuries by the creation of certain exceptions; such as, impossibility imposed by law, and the death or permanent incapacity of the person whose personal services formed the essential element of the contract. There are also more general exceptions which fall under the general heading of what could reasonably have been foreseen or contemplated by the contracting parties. Williston states, *supra*, at page 5411, "[t]he important question is whether an unanticipated circumstance has made performance of the promise virtually different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown, upon the promissor."

At Section 6(b) of the Annotation, *supra*, at page 39, it is stated:

"* * * the test based on reasonable foreseeability would appear to be supported by reason and a practical working value to the courts."

See *The London & Lancashire Indemnity Co., supra*, paragraph three of the syllabus.

Stated in reverse, impossibility of performance caused by developments which the promissor could have prevented or avoided or remedied by appropriate corrective action does not excuse him from liability for nonperformance. *Baumer* v. *Franklin County Distilling Co.* (C. A. 6, 1943), 135 F. 2d 384, certiorari denied 320 U. S. 750.

Considering all the facts and circumstances in evidence in the instant case, the Executor could reasonably have foreseen the glaring probability that the decedent's children would remove articles from the real estate that should have passed with the title to the real estate. In particular, there were discussions on several occasions about how to determine a fixture between the Executor and Mr. Hogan, thus putting the Executor on notice that something was afoot; the question was raised about removal of fixtures at the closing (prior to removal of the items); and the special treatment of the Viking Ship light fixture in the purchase contract demonstrates that the parties were aware of the fixture problem.

*Judgment accordingly.*