WILLIAMS, ADMX., ET AL., APPELLANTS, *v.*
GRANT ET AL., APPELLEES.█

[Cite as Williams v. Grant (1979), 65 Ohio App. 2d 225.]

█

(No. E-78-50—Decided August 3, 1979.)

█

*Murray & Murray Co., L.P.A.,* and *Mr. Patrick Murray,*
for appellants.

*Flynn, Py & Kruse Co., L.P.A.,* and *Mr. Raymond N. Watts,* for appellees.

POTTER, P. J.   The legal proceeding resulting in this appeal was initiated by the filing of a complaint and subsequently an amended complaint in the Court of Common Pleas of Erie County, wherein Ruth Williams, individually and as administratrix of the estate of James Williams, deceased, and the United States, Veterans Administration, were plaintiffs. John F. Grant and John F. Grant, M.D., Inc., were defendants (hereinafter defendant refers to Dr. Grant and defendants refers to Dr. Grant and the corporation).

The first count of the complaint was by the administratrix for the wrongful death of James Williams to recover the pecuniary loss suffered by Ruth Williams, wife of the deceased, and her three nieces. The second count was for medical and hospital expenses and for the funeral bill and burial expense sustained by Ruth Williams, individually. The third count, by the United States, was for medical and hospital care and treatment furnished to James Williams.

The thrust of the action was alleged medical malpractice resulting in the untimely death of James Williams. Plaintiffs

alleged that defendant negligently removed a malignant melanoma from the left chest wall of the decedent by electrodesiccation on October 8, 1973. Plaintiffs alleged that the improper and negligent removal by defendant prevented a timely diagnosis of malignant melanoma by a pathologist, which, in any event, was made impossible by the method of removal and was not ordered. Plaintiffs also asserted that on June 10, 1974, when James Williams again presented himself to defendant with a swelling or enlargement of the lymph nodes under the left armpit, defendant was allegedly negligent in the treatment prescribed by him.

The lesion previously referred to was "a mole" approximately one centimeter by two centimeters. A malignant melanoma is a skin cancer first noticeable as a pigmented spot on the skin and is darker than a normal spot on the skin. A hemangioma is a benign skin lesion, containing many capillary blood vessels. Generally, a hemangioma will blanch upon pressure. A melanoma should not blanch because of the pigment. Defendant claimed that he removed a hemangioma by electric cautery and that this was a normal and accepted practice. Plaintiffs claimed that the lesion was a malignant melanoma and should have been removed by a wide incision and sent to a pathologist for examination and that timely and appropriate treatment should have followed.

James Williams was treated in June 1974 by defendant with antibiotics and then admitted to Providence Hospital in Sandusky, Ohio on July 10, 1974. He voluntarily removed himself on July 12, 1974. Also on July 12, 1974, he entered the Veterans Administration Hospital in Cleveland, Ohio. A biopsy performed on July 16 of the lymph nodes under James Williams' left armpit disclosed malignant melanoma. He was subsequently operated upon on July 25, 1974, in the area of the mass and the original lesion. Slides prepared of tissue taken from the site of the original lesion showed no cancer cells. Williams died on September 5, 1974. The clinical diagnosis of the cause of death was widespread malignant melanoma. There was no autopsy performed.

This case was well tried by competent counsel from July 13 until July 19, 1978, to a jury. Several expert witnesses were presented and the evidence was conflicting. Plaintiffs introduced evidence generally as above outlined; whereas the

defendant, Dr. John F. Grant, asserted that on October 8, 1973, he removed a superficial hemangioma and that his procedures on June 10, 1974, and thereafter, were proper and in accordance with medical practice in 1973 and 1974. Other defense experts and testimony supported the 1973 procedure and also supported a conclusion that the melanoma had either spread to the lymph nodes and other parts of the body prior to the electrodesiccation of October 8, 1973, or that there was another primary site. The defense witnesses testified that, in any event, Williams' death would have occurred approximately when it did, and that in 1973 chemotherapy had not been perfected as a successful cure of melanoma.

The jury returned a verdict for the defendants. From the judgment on the verdict and the overruling of a motion for a new trial, Ruth Williams, individually and as administratrix, filed her appeal. She has assigned the following assignments of error:

"I. The verdict is against the weight of the evidence.

"II. The trial court erred in that portion of the charge which instructed the jury that the plaintiffs had to prove a probability of survival in order to recover any damages.

"III. The trial court erred in permitting defendant's doctors to testify as to possibilities not probabilities.

"IV. The trial court erred in making remarks designed to discredit plaintiffs' medical expert, Dr. Robert Ailes.

"V. The trial court erred in not permitting plaintiffs' medical experts to testify as to the ultimate issues in the case."

We have carefully examined the record in this case and find that the plaintiffs had a fair trial, that there were no prejudicial errors and that the verdict was not against the weight of the evidence. Therefore, we find all assignments of error not well taken.

As to the first assignment of error relative to the weight of the evidence, we have already outlined the conflict in the evidence as to the nature of the lesion, treatment and the probability of survival. The first assignment of error relative to manifest weight also has to be considered with the second assignment of error which goes to the issue of the proximate cause of James Williams' death. Plaintiffs claim that the following charge relative to proximate cause was error:

"In an action for wrongful death, as a result of alleged

medical practice, the Plaintiffs must show by a preponderance of the evidence that the decedent's death was caused by doing***something that a physician of ordinary skill, care and diligence would not have done, or by the failure to do something that such a physician or surgeon would have done under like or similar circumstances. And that with proper diagnosis and treatment, that the decedent would probably have survived. In other words, the Plaintiffs must prove by the greater weight of the evidence, not only that the Defendant's diagnosis and treatment fell below the standard of a reasonable careful physician or surgeon, but also that such diagnosis and treatment if you find it to be negligent, was probably the proximate cause of the . . . of James Williams' death.''

Plaintiffs assert that they established a prima facie case of survival with prompt diagnosis and treatment, that the burden should have shifted to the defendants to prove that cancer cells had probably spread to other areas at the time the lesion was removed and, furthermore, that they should have had a jury instruction that there was a shortening of the decedent's life span by defendant's allegedly negligent treatment.

We have already noted the conflict of evidence relative to the type of lesion and as to treatment. A conflict also existed as to the chances of survival within the state of the art in 1973. Furthermore, we are confronted with R. C. 2125.01 which gives a right to recover damages, "[w]hen the death of a person is caused by wrongful act, neglect, or default***." Following, as we do, the mandate of the Ohio Supreme Court, we must necessarily consider the case of *Cooper* v. *Sisters of Charity* (1971), 27 Ohio St. 2d 242. The syllabus of that case is as follows:

"In an action for wrongful death, where medical malpractice is alleged as the proximate cause of death, and plaintiff's evidence indicates that a failure to diagnose the injury prevented the patient from an opportunity to be operated on, which failure eliminated any chance of the patient's survival, the issue of proximate cause can be submitted to a jury only if there is sufficient evidence showing that with proper diagnosis, treatment and surgery, the patient probably would have survived.''

As defendants assert, neither the statute nor the case law recognizes any recovery for the loss of any chance of survival.

In regard to these two assignments of error we also note that the parties agreed that there was no evidence as to pain or suffering by the decedent; and the briefs of the parties make no contention that this action falls within the purveiw of R. C. 2305.21, pertaining to the survival of causes of action which may have arisen in favor of the deceased in his lifetime for injuries to his person or property. Furthermore, the parties have not briefed the legal theory or right of Ruth Williams to recover, individually, for monies which she expended for medical, hospital and burial expenses and for the funeral bill. Nevertheless, if Ruth Williams, individually, had a cause of action, the general verdict of the jury was adverse to her and is supported by our findings relative to the various assignments of error.

The third assignment of error concerns the questions directed by defense counsel to Dr. Hoffman, as set forth below:

"Q. Well, I want to direct your attention and your answers and thinking so as to base it solely on the material contained in the Veteran's Hospital . . . Veteran's Administration Hospital record, for Mr. Williams, where he was admitted in July, July 12th, 1974, and ignoring if you will please for the purpose of these questions, Doctor Grant's testimony as to what he removed by electrodesiccation on October 8, 1973. Other than the fact that he did electrodesiccate some . . . And just based on what appears to you from that chart. Do you have an opinion based on a reasonable medical probability, as to what Mr. Williams' chances of survival were, as of October 8, 1973, if the treatment had been afforded to him as suggested in that hospital chart, and in Doctor Johnson's testimony. In other words, meeting his prescribed medical standards for a lesion as described in those hospital records.***"

Subsequently, Dr. Hoffman stated:

"A. ***Since the lesion was cauterized it would not be considered proper treatment but on the other hand the fact that there was no evidence either at the time of his admission to the hospital nor did he develop any lesion surrounding it, nor did the pathologist find any evidence of tumor surrounding the cautery site, would lead me to conclude that the lesion had been totally removed at its origin. However, we know, of course, that it had spread to the lymph nodes and we must sur-

mise also that it spread through the blood stream to the various parts of the body.***

"So we must assume that the patient had . . . already had spread of the melanoma.

"Q. At what time, Doctor, when?

"A. At the time the cautery was carried out."

Plaintiffs also claim error in the admission of the following testimony of Dr. O'Halloran:

"Q. All right. It doesn't appear that there was one. So, Doctor, is it possible that there would be other sites other than the lesion that was burned out, to account for metastasis into the lymph nodes?

"A. Yes, of course.

"Mr. Murray:***[I] object, to the possibility, Your Honor, I think that the Doctor's supposed to be testifying to a reasonable degree of medical certainty, as Mr. Watts is . . .

"Mr. Watts: Well, Your Honor, the rules are changing, depending on who's examining whom, I see.

"Mr. Murray: Well, I have noted an objection, Your Honor, this is Mr. Watts' witness, and I would, I think talking about the possibilities, certainly is out of bounds.

"The Court: Too late now, overruled. Cross-examine. You can cross-examine on it. That point.

"***

"Q. What is the fact Doctor? That on the basis of all of these studies that we've been talking about, the lack of any cells, in the area where Doctor Grant burned off a lesion, and the fact that there was metastasis into those lymph nodes at some later date, what is the fact Doctor, as to whether or not that leaves as a [sic] entirely consistent logically, the existence of some primary lesion other than what he burned off.

"A. This is a possibility which has to be considered.

"Q. All right.

"Mr. Murray: I would note an objection to the answer. I'll no . . . object and ask that it be stricken.

"The Court: You're . . . you're objecting to the answer?

"Mr. Murray: And the question. On the . . .

"The Court: They're both overruled."

As we have indicated, there were many expert witnesses and their testimony was elicited by competent, well-informed counsel. Much repetition was permitted on every facet of the

case. We find these isolated bits of testimony above referred to, if error, to be harmless.

The fourth assignment of error goes to the following comments by the court:

"Well, of course, you're guessing, Doctor.

"* * *

"He said yes. It doesn't make a difference.

"Well, you . . . of course, you've been there, but you assume that—

"Well, there's some dispute about that."

We find no objection by plaintiffs' counsel to the foregoing. Apparently, these comments did not adversely impress him then; they do not adversely impress this court now. Considering the entire trial, the plaintiffs were not prejudiced.

The fifth assignment of error goes to the sustaining of an objection to the following question:

"Q. Doctor, do you have an opinion to a reasonable degree of medical certainty, as to whether or not a physician practicing in this community, would *be exercising ordinary care* if he removed any lesion skin lesion, other than a wart . . . and failed to send it in for a pathological examination. Do you have an opinion?" (Emphasis added.)

Again, we must emphasize that the many experts set forth what was the proper standard of care in their opinion. We note that for this one specific question there was no proffer. We think that the trial court properly ruled when it stated the following: "The Court: He can testify as to what the general practice is." See, also, *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127, at paragraph one of the syllabus, as follows:

"1. In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."

Further, the court in *Bruni, supra,* at pages 131 to 132, expressed the following:

"Proof of the recognized standards must necessarily be provided through expert testimony. This expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place, according to the body of law that has developed in this area of evidence.*\*\*\**"

For the foregoing reasons, we find plaintiffs' assignments of error not well taken. The judgment of the Court of Common Pleas of Erie County is affirmed.

*Judgment affirmed.*

BROWN and CONNORS, JJ., concur.