**LAMBERT, ADMR., Appellee,**

v.

**SHEARER, Appellant;**

**Beechwold Medical Center et al., Appellees.**

[Cite as *Lambert v. Shearer* (1992), 84 Ohio App.3d 266.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–1391.

Decided Dec. 15, 1992.

268

*Wolske & Blue* and *Gerald S. Leeseberg;* and *Michael S. Miller,* for appellee Nancy Lambert.

*Isaac, Brant, Ledman & Becker, Charles E. Brant* and *Donald L. Anspaugh,* for appellant.

PETREE, Judge.

Defendant, Earnest Shearer, D.O., appeals from the Franklin County Court of Common Pleas, where a jury assessed $2.4 million in damages against him in this

medical malpractice action. Since we find that the trial court committed various prejudicial errors, we must reverse.

In 1988, Wayne Lambert's continued flu and cough symptoms prevented him from running his family restaurant in Urbana, Ohio, and he therefore sought medical attention. At the time, he had no personal physician and rarely went to any doctor because he had been a healthy forty-eight-year-old man. Since he ran the restaurant himself, he always tried to take care of himself, but he never could end his lifelong habit of smoking up to three packs of cigarettes per day.

Lambert's illness prompted him to call Dr. Karl Lee, an Urbana osteopath and former restaurant patron. When Lambert visited Dr. Lee, he presented with symptoms of fever, nausea, diarrhea, and coughing. At this first visit, the doctor examined him, prescribed some antibiotics, and had a chest X-ray done on January 21, 1988. But Lambert's condition worsened. He saw Dr. Lee again and the doctor ordered another chest X-ray, which was done on February 1, 1988. Dr. Lee habitually read his own X-rays instead of waiting for a radiologist to do so. He originally diagnosed Legionnaire's disease but later changed this to acute pneumonia. Since Lambert's condition and his lung congestion did not improve under Dr. Lee's care, he decided to seek a second opinion.

At the suggestion of family friend Mable Ray, Lambert paid a visit to defendant, who treated Mable's deceased husband George at the Beechwold Medical Clinic in Columbus, Ohio. Defendant is an osteopath who uses "homeopathic," or natural healing methods, in his practice.[1] His homeopathic treatments include manipulative therapy, much like that employed by an ordinary chiropractor. Further, they include the use of various nutritional supplements in lieu of prescription drugs. They also include a host of what are popularly called "alternative" or nontraditional medical methods.[2]

When he first met defendant, Lambert was awed by the doctor's appearance and manner. Defendant is an elderly, distinguished-looking gentleman. The doctor then gave Lambert an extensive and exhausting tour through the clinic, which is located in a converted house. The clinic is not listed in the yellow pages of the telephone book, as defendant does not advertise. Lambert, who had little

---

1. For a collection of cases dealing with this type of medical practitioner, see Annotation, Liability of Chiropractors and Other Drugless Practitioners for Medical Malpractice (1990), 77 A.L.R.4th 273.

2. For instance, in caring for Lambert, defendant's treatments included "oxygen baths," which entailed putting Lambert in a plastic bag full of oxygen on the belief that the oxygen would go through the skin by osmosis and clear the clogged-up lungs. Defendant also used Japanese Reiki massage, which was performed by a Japanese woman. He used Slippery Elm Tree Bark tea to stop the hacking cough. He said he treated plaintiff with manipulative treatments like "foot reflexology," "diathermy," acupuncture, and "osteo-musculoskeletal" manipulation.

experience with medical facilities, felt that some of the clinic's equipment looked old and homemade. But he nevertheless trusted defendant because he appeared to be an experienced, "impressive" man. Several other doctors practiced with him at the clinic. Defendant never said to Lambert that he limited his practice to supplemental treatments.

Lambert was so impressed that he continued coming to defendant for weekly medical care from February 1988 through November 1988. Despite defendant's assertions during trial that he only does treatments and not diagnoses, he admitted that he diagnosed Lambert's ailments on numerous occasions. Indeed, the barebones medical records he kept show this. For instance, he told Lambert that he had amoebic dysentery, a parasitic bowel disease. He also diagnosed him as having influenza and pneumonia. Then, on March 12, 1988, he diagnosed something called "paratyphoid" fever. Defendant likewise noted on his charts that Lambert had "cabin fever." On April 14, 1988, he said Lambert's problem was "occlusive peripheral arterial disease," or, in other words, hardening of the arteries. On June 23, 1988, defendant made a diagnosis of emphysema.

In addition, defendant plainly performed diagnostic procedures. For instance, defendant gave Lambert an AIDS test because he claimed that Lambert came in and intimated that he had AIDS. He also checked Lambert's "heart circulation" on some electrical device called a "Heartometer." Aside from ordering a urinalysis, he further had a staff chiropractor examine Lambert's blood under a "dark field" microscope to examine its "condition." Defendant admitted that the dark field microscope is used to diagnose acute syphilis and that he once informed Lambert that he suffered from gonorrhea. Defendant said that tests from England showed a mild strain of gonorrhea that Lambert somehow "inherited" from his grandparents.

For some reason, defendant sent samples of Lambert's blood to England where a Dr. Upton supposedly examined it. Defendant had met this Dr. Upton on one occasion thirty years ago while studying in England for several weeks. Defendant said that now Dr. Upton is an elderly, nonpracticing homeopath whom he occasionally asks to do some sort of homeopathic tests that can not be done in the United States. Defendant says he gets the desired results from England. He claimed that some of the diagnoses made in this case were not actually his, but were really Dr. Upton's conclusions. Needless to say, he did not produce Dr. Upton as a witness at trial.

During the nine months of this type of diagnosis and care, Wayne Lambert's cough and lung problems got progressively worse. Consequently, Lambert became progressively dissatisfied and eventually left defendant's care in November 1988. On that very day, defendant saw a medical doctor, who immediately diagnosed him as having advanced lung cancer.

Because Lambert had gone for months without a diagnosis of cancer, he had to have one lung surgically removed. But even this treatment came too late. The cancer had spread and he became terminally ill. His posthumous video deposition testimony revealed a thin man, occasionally gasping for air and repeatedly grabbing his chest because of the pain.

Lambert lived like this for two years after his surgery. He became weaker and weaker as his cancer-riddled lung struggled to breathe. Eventually, Lambert ended up in the hospital and essentially smothered to death because of the cancerous lung. He was survived by his wife, Nancy Lambert, and his adult-aged children.

The instant wrongful death and survivorship suit was commenced and tried before a jury.[3] The plaintiff's case consisted of questioning defendant about his misdiagnosis, Lambert's posthumous video testimony, expert testimony from a radiologist and an oncologist, and testimony from Lambert's wife, who related to the jury the damages suffered on account of defendant's malpractice. Defendant did not present any medical expert in defense of his actions.

The trial court directed a verdict in plaintiff's favor on all issues except damages. The jury then awarded $2.4 million on a general verdict form. Defendant timely appealed.[4]

### I. Punitive Damages

Defendant's first and second assignments of error contend that plaintiff improperly influenced the jury's assessment of damages by arguing an unpleaded claim for punitive damages and that the trial judge should have cautioned the jury about awarding such damages.

Punitive damages need not be specially pleaded or claimed. *Brookridge Party Ctr., Inc. v. Fisher Foods, Inc.* (1983), 12 Ohio App.3d 130, 12 OBR 451, 468 N.E.2d 63. See, generally, Ghiardi & Kircher, Punitive Damages: Law and Practice (1992) 16, Section 9.02. If a jury's award of punitive damages does not exceed the amount of a plaintiff's general demand under Civ.R. 54(C), then such damages are recoverable so long as the evidence presented, in accordance with plaintiff's claims, warrants their allowance. *Id.,* 12 Ohio App.3d at 131, 12 OBR at 452, 468 N.E.2d at 65; *Steinbeck v. Philip Stenger Sons* (1975), 46 Ohio App.2d 22, 75 O.O.2d 25, 345 N.E.2d 633. See, also, *Mers v. Dispatch Printing Co.* (1988), 39 Ohio App.3d 99, 529 N.E.2d 958, and *Cincinnati Art Galleries v. Fatzie*

---

3. The named plaintiff is Nancy Lambert, individually and as administrator of the estate of Wayne Lambert. She will be referred to as "plaintiff" herein.

4. Defendant's fifteen assignments of error are printed in the appendix to this opinion.

(1990), 70 Ohio App.3d 696, 591 N.E.2d 1336. Of course, plaintiff must claim facts from which the essential element of "actual malice"[5] may be inferred. *Columbus Finance Co. v. Howard* (1975), 42 Ohio St.2d 178, 183, 71 O.O.2d 174, 176, 327 N.E.2d 654, 658; *Convention Ctr. Inn, Ltd. v. Dow Chem. Co.* (1984), 19 Ohio Misc.2d 15, 19 OBR 422, 484 N.E.2d 764. Cf. *Studier v. Taliak* (1991), 74 Ohio App.3d 512, 599 N.E.2d 718.

Here, plaintiff's complaint did not mention punitive damages, but instead requested compensatory damages based on defendant's "professional negligence." Plaintiff later filed her "Statement of Damages," specifying general and special damages of $3 million. Just before trial, plaintiff sent a letter to defense counsel indicating an intent to claim punitive damages. Before any proceedings began, however, defense counsel informed the court that plaintiff had failed to amend the complaint to bring punitive damages into issue. The court noted the objection and asked plaintiff's counsel if he was willing to take the risk and go ahead and present the unpleaded issue. Plaintiff's counsel agreed to take that risk.[6]

Thereafter, during *voir dire*, plaintiff's counsel repeatedly questioned potential jurors about their willingness to award punitive damages. Further, during opening statements, plaintiff's counsel referred to the necessity of punitive damages herein. Defense counsel objected, refusing to consent to trying the issue. Believing it was unnecessary, plaintiff never filed a motion to amend to allege facts supporting an award of punitive damages. The trial court ultimately did not instruct the jury on the issue of punitive damages.

We conclude that the trial court erred in allowing plaintiff to make statements concerning punitive damages after defendant's strenuous objections. Plaintiff should have been required to amend the complaint to allege facts supporting an inference of malice as soon as it became clear that such an award could be justified. Though it is permissible to seek to litigate an issue through implied consent under Civ.R. 15(B), plaintiff cannot keep trying to inject the issue into the trial after defendant's legitimate objections. The trial court should have limited the plaintiff's efforts and not let the unpleaded issue permeate the trial as it did.

---

5. Such malice exists when the facts demonstrate (1) a state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of others that has a great probability of causing substantial harm. *Calmes v. Goodyear Tire Rubber Co.* (1991), 61 Ohio St.3d 470, 575 N.E.2d 416; *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174; *White v. Moody* (1988), 51 Ohio App.3d 16, 554 N.E.2d 115.

6. We note that the common-law right to punitive damages is now codified in R.C. 2315.21, which also sets forth a new statutory procedure for the imposition of such damages in tort actions. This provision requires the court to set the *amount* of punitive damages after the trier of fact determines liability for them under the "malice" standard codified in the statute.

■ However, we reject defendant's arguments concerning plaintiff's assertions of defendant's recklessness. Defendant's answer claimed that Wayne Lambert was contributorily negligent. As the Supreme Court of Ohio recently noted in *Schellhouse v. Norfolk & W. Ry. Co.* (1991), 61 Ohio St.3d 520, 525, 575 N.E.2d 453, 456, contributory negligence and comparative negligence are no defense to a reckless or intentional tort. Plaintiff was entitled to defend against the charges of contributory or comparative negligence irrespective of the absence of allegations concerning actual malice for punitive damages purposes.

■ Last, we reject defendant's arguments that the trial court failed to give a cautionary instruction on punitive damages. Defendant never once requested such an instruction and thereby avoided reminding the jury about the subject. We decline to fault the trial judge for failing to do what was never requested of him. Moreover, the decision to give a cautionary instruction will not be disturbed on appeal unless there is an abuse of discretion. *Berlinger v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 830, 840, 589 N.E.2d 1378, 1384.

Defendant's first assignment of error is well taken, but defendant's second assignment of error is not well taken.

## II. Improper Expert Testimony

■ Defendant next levels several attacks at the expert testimony of plaintiff's oncologist, Raymond Weiss, M.D. Preliminarily, we note that Evid.R. 702 allows expert testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue. *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 19 OBR 71, 482 N.E.2d 955. Hence, an expert need not be the best witness on a particular subject. *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 169, 528 N.E.2d 603, 606. Rather, the expert must only be capable of aiding the trier of fact.

Defendant's sixth assignment of error asserts that plaintiff should not have been permitted to ask Dr. Weiss leading and "inflammatory" questions. For instance, on one occasion plaintiff's counsel asked Dr. Weiss: "Doctor, do you consider Dr. Shearer's care to have been grossly negligent?" Further, he also asked: "Do you consider Dr. Shearer to have been reckless in his disregard for Wayne Lambert's health and well-being?" Dr. Weiss answered these questions in the affirmative, over defendant's objections.

■ Under Evid.R. 611(C), leading questions are not the appropriate mode of eliciting testimony on direct examination, but this form of question may be permitted in the exercise of sound discretion by the trial court. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828; *Seley v. G.D. Searle & Co.* (1981), 67 Ohio St.2d 192, 204, 21 O.O.3d 121, 128, 423 N.E.2d

831, 840. A leading question is one which suggests an answer to the person being examined through either verbal or nonverbal cues. See 1 McCormick on Evidence (1992) 17–18, Chapter 2. *Corwell v. W. Reserve Bank* (1854), 3 Ohio St. 406. By the restriction on leading questions the law seeks to encourage honest, narrative answers as opposed to positions put forth by counsel. McCormick, *supra,* at 16.

▮ Concededly, the questions at issue could be construed as leading and the trial court should have required plaintiff to restate them. But, as discussed below, Dr. Weiss's answers clearly communicated his own thoughts about defendant's actions in any event. We fail to see any clear prejudice from the mere *form* of these challenged questions. Defendant's real quarrel is that these questions are framed in terms of legal lexicon. Defendant thus claims that they improperly sought expert opinion on the so-called "ultimate issues" of the case.

Evid.R. 704 expressly provides that testimony is not objectionable " * * * solely because it embraces an ultimate issue to be decided by the trier of fact." Though this rule permits testimony on an ultimate issue, it does not require admission of it. *McQueen v. Goldey* (1984), 20 Ohio App.3d 41, 47, 20 OBR 44, 49, 484 N.E.2d 712, 719. For such lay testimony must still be relevant. And such expert testimony must still aid the trier of fact.

As noted above, plaintiff needed to have Dr. Weiss characterize how very bad the medical care given to plaintiff was so that recklessness could be proven. The jury would have no effective way of assessing defendant's conduct unless this type of testimony was elicited. The questions did not simply call for legal conclusions. A medical malpractice case is " * * * 'one of the classic examples of the *necessity* of expert opinion testimony as to the ultimate issue.' * * * " (Emphasis *sic*.) *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 162, 10 O.O.3d 332, 336, 383 N.E.2d 564, 568. Like necessary testimony from a physician about whether a defendant doctor deviated from the accepted standard of care, necessary testimony about the extent of the deviation should be allowed when recklessness or higher culpability is in issue. Moreover, defendant's semantic argument that plaintiff could have used other, less objectionable language to bring this out fails to demonstrate any real prejudice on the record presented.

Defendant's sixth assignment of error is not well taken.

▮ Defendant's seventh assignment of error claims that Dr. Weiss was not competent to disparage the field of homeopathic medicine. Actually, in response to a question about the care defendant used in generating and maintaining medical records, Dr. Weiss retorted: "It was non-medical care. It was witchcraft." Later, in response to plaintiff's inquiry concerning whether defendant

was reckless towards the health and well-being of Wayne Lambert, Dr. Weiss responded: "There was no medical care given whatsoever to this patient. As I said, what was done is pure quackery and witchcraft, something that I would expect in the middle ages in Europe, but not in the 1990's and in Columbus, Ohio."

Defendant lodged a general objection to this testimony with no specific explanation of error. Assuredly, this testimony was damaging to defendant, but as we noted above it aided the trier of fact in gauging recklessness. Contrary to defendant's contention, this testimony appears to center around the specific care given by defendant, as opposed to merely leveling some irrelevant professional attack.[7] We cannot say that the trial court abused its discretion in allowing such testimony.

Defendant's seventh assignment of error is not well taken.

■ Defendant's ninth assignment of error challenges Dr. Weiss's brief summary of Wayne Lambert's medical history from the medical records presented. The authenticity of these records was stipulated and they were eventually admitted without objection. Specifically, plaintiff's counsel asked Dr. Weiss for a brief "chronology" or case history, based on the medical records he reviewed. The doctor responded by stating the facts of the case: symptoms, treatments, diagnoses, progression of the illness, diagnosis of cancer, surgical removal of the lung, and eventual death. At trial, defendant objected on the grounds that there was no foundation, that Dr. Weiss was not a treating physician, and that the medical records were hearsay.

The testimony in question demonstrated the doctor's knowledge and construction of the medical records, highlighting the important events for the jury. It supported his expert opinion.

There is absolutely no restriction in the law that only treating physicians can testify in medical malpractice actions. Evid.R. 703 expressly provides that the " * * * facts * * * upon which an expert bases an opinion * * * may be those perceived by him or admitted in evidence * * *." Indeed, under Evid.R. 705, an expert may give an opinion only " * * * after disclosure of the underlying facts or data [and that] * * * such disclosure may be in response to a hypothetical question *or otherwise*." (Emphasis added.) If defendant wanted to delve more deeply into the records themselves or challenge Dr. Weiss's construction of the

---

7. We acknowledge that here has been an historical struggle between the two schools of medicine, allopathy and osteopathy. And there have been claims of quackery in the past. See Woodside, Lawson & Lydon, Law of Medical Practice in Ohio (1989) 50, Section 1:12. But Dr. Weiss's comments do not appear to be aimed at attacking osteopathy or homeopathy as such, but rather appear to attack defendant's actions with regard to the decedent.

evidence, he could have done so by cross-examination. Or, he could have presented his own expert evaluation, but he failed to do so.

■ Moreover, aside from Evid.R. 703 and 705, medical records have been generally recognized as admissible under the so-called "business records" hearsay exception of Evid.R. 803(6). *Ohio Dept. of Mental Health v. Milligan* (1988), 39 Ohio App.3d 178, 180, 530 N.E.2d 965, 967. Since the medical records here were admitted as such and their authenticity was stipulated, we cannot conclude that Dr. Weiss testified on the basis of inadmissible hearsay. Cf. *Blakeman v. Condorodis* (1991), 75 Ohio App.3d 393, 396, 599 N.E.2d 776, 778 (expert permitted to testify on review of radiologist's findings).

Defendant's ninth assignment of error is not well taken.

■ Defendant's third assignment of error assails Dr. Weiss's testimony concerning proximate cause, calling it "speculative." As will be discussed more fully below, Dr. Weiss testified that if there had been an earlier and proper diagnosis, it is more likely than not that Wayne Lambert would have survived the lung cancer. To do this, Dr. Weiss explained the familiar four-stage analysis of cancer and the associated five-year survival statistics used in the medical field and often presented in cancer litigation. Defendant did not affirmatively attack the efficacy of the analysis or the statistics themselves by virtue of expert testimony, but instead cross-examined Dr. Weiss about his application of them to this case. We conclude that the trial court did not abuse its discretion in admitting this testimony.

Defendant's third assignment of error is not well taken.

### III. Cross-examination on Rate of Expert's Compensation

■ Defendant's eighth assignment of error claims that the trial court erred by prohibiting any cross-examination of plaintiff's medical expert on his rate of compensation for testifying. On this score, Dr. Weiss intimated on direct that he was selflessly appearing on his own vacation time and representing no one but himself. Defense counsel was able to get out that the doctor was being paid, that he had worked for plaintiff's counsel as an expert witness before, and that he had consulted on about two medical malpractice cases per month for the past eleven years. The trial court disallowed any further cross-examination about how much the doctor was being paid in this case.

"The scope of cross-examination of a medical expert on the questions of the expert's bias and pecuniary interest and the admissibility of evidence relating thereto are matters that rest in the sound discretion of the trial court." *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008, syllabus. Generally, one may show an expert witness's bias by inquiring as to whether the

expert was paid a fee, but inquiry into the amount of the fee has been held improper. *Milligan, supra,* 39 Ohio App.3d at 179, 530 N.E.2d at 967.

Defendant argues that this court's proscription against any inquiry into the rate of compensation, as stated in *Milligan,* should not have been followed under these circumstances. We agree. Unlike *Milligan,* which was a special commitment proceeding with a state-appointed expert that was tried before a judge, the present case involves a trial before a jury where the paid expert painted a picture that he came all the way across the country and volunteered his time on the firm conviction that defendant committed egregious malpractice that had to be stamped out. It was an abuse of discretion to cut off further inquiry and disallow defendant to erase such powerful impressions. Dr. Weiss opened himself up to an inquiry into his fees. But the trial court still has substantial discretion under Evid.R. 403(B) to limit such cross-examination, among other things, if it is not done in a dignified fashion.

Defendant's eighth assignment of error is well taken.

## IV. Directed Verdict

Defendant's fourth assignment of error asserts that it was error to deny defendant's motion for a directed verdict on the liability issues of this case. Defendant's fifth assignment of error further challenges whether there was sufficient evidence to direct a verdict in favor of plaintiff on these issues. A motion for a directed verdict tests the legal sufficiency of the evidence. *Mayhorn v. Pavey* (1982), 8 Ohio App.3d 189, 191, 8 OBR 258, 260, 456 N.E.2d 1222, 1225. The motion will be granted for plaintiff where the substantial evidence presented demonstrates that reasonable minds could only find in favor of plaintiff on the essential issues of the case. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896.

In order to establish malpractice, plaintiff must demonstrate that the injury complained of was caused by a practice that a physician of ordinary skill, care, or diligence would not have employed, and that plaintiff's injury was the direct and proximate result of such practice. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus. Proof of malpractice thus requires evidence of the pertinent recognized standard of the medical community and that the physician negligently departed from that standard. *Id.* at paragraph one of the syllabus. Ordinarily, the issue of whether the physician has employed the requisite care must be determined from the testimony of experts, unless the standard of care is sufficiently obvious that laymen can reasonably evaluate the physician's conduct. *Id.*

■ As the trial judge noted, the evidence presented established beyond any fair debate that defendant committed malpractice. The trial judge concluded that defendant held himself out as a physician. Further, during trial defendant essentially admitted his negligence by failing to have a follow-up X-ray performed and by failing to refer Lambert to a doctor who could diagnose his cancer.

Dr. Weiss, a cancer specialist who in the past has practiced at the prestigious National Cancer Institute, testified that he was familiar with the practice of allopaths and osteopaths. Several osteopaths practice at the Walter Reed Hospital, where he currently practices. He testified that, given Wayne Lambert's February 1988 symptoms and his history of smoking, the standard of medical care required defendant to have a follow-up X-ray done on Lambert's lungs. He said that the X-ray would have shown a worsening of the lung infiltrates or obstruction and this then would require a bronchoscopy, which is a diagnostic procedure involving insertion of a camera through a tube in the lung. He concluded that the bronchoscopy would have shown cancer and a biopsy would have confirmed it. He said that if defendant could not perform these procedures, then he should have referred Lambert to someone who could.

Defendant acknowledged that he does not have an X-ray on the premises, but says he refers patients to have them if necessary. He explained that he dislikes X-rays and would not refer patients out for one unless they had failed to improve through homeopathic methods. Defendant admitted that he was familiar with the early warning signs of lung cancer, such as when a smoker has persistent new coughing and there is a spitting up of blood. Defendant acknowledged that plaintiff had told him he smoked three to four packs of cigarettes daily and that defendant gave him filters to help him quit. Defendant claimed that Lambert did not complain about coughing up blood prior to June 23, which is the first mention of this in the defendant's medical records. He denied the truth of the patient's testimony that he presented coughing up flecks of blood on his initial visit to the clinic. Defendant admitted that he suspected plaintiff as having cancer later "in the course of * * * his progress." In any event, defendant said that if he would have known earlier that the patient was coughing up blood he still would have treated him for pneumonia and would not have referred him to a specialist. However, defendant later said that he should have had the patient X-rayed or referred to a specialist.[8] In actuality, the only referral that defendant made

---

8. Plaintiff's counsel was able to elicit the following evidence on defendant's culpability by questioning defendant: Q. "Was there an indication with Mr. Lambert that would have prompted you to refer him out for an x-ray? You didn't send him for an x-ray, did you?" A. "No, we didn't." Q. "Did you ever have an indication in your mind of a need for an x-ray?" A. "We should have had him x-rayed." Given the diagnoses of acute pneumonia, defense counsel asked if it was "* * * standard medical practice to do follow-up x-rays to see if, in fact, the infiltrate clears?" Defendant admitted that it was. Q. "* * * [B]ecause * * * you

during the nine months was to suggest to Lambert that he see an Amish psychic and spiritual healer named Solomon Wickey, who lives in Indiana.

 Defendant argues that this testimony was insufficient to even go to the jury because Dr. Weiss could not comment on how defendant deviated from accepted principles of homeopathy. We disagree.

The trial court is most often in the best position to assess an expert's competency and qualifications. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. Further, in evaluating a trial court's rulings on an expert's competency and qualifications against these standards, the appellate court applies an abuse of discretion test. *Id.; Frank v. Vulcan Materials Co.* (1988), 55 Ohio App.3d 153, 563 N.E.2d 339.

In the context of a medical malpractice case, it has been held that, where fields of medicine overlap and more than one type of practitioner may perform the diagnosis or treatment, a medical witness may qualify as an expert, even though he does not practice in the same specialty as the defendant. *King v. LaKamp* (1988), 50 Ohio App.3d 84, 85, 553 N.E.2d 701, 702 (orthopaedic surgeon may testify against a podiatrist). Again, the touchstone of admissibility is whether a particular witness will aid the trier of fact. *Id.*

In *Willett v. Rowekamp* (1938), 134 Ohio St. 285, 12 O.O. 91, 16 N.E.2d 457, the Supreme Court of Ohio held that a medical doctor in general practice could testify about a chiropractor's failure to X-ray a patient's back injury prior to manipulation. Though the medical doctor was not of the same school of medicine as the defendant chiropractor, the court said that the medical doctor could testify about what the applicable standard of care was if he had knowledge of it.

In the present case, Dr. Weiss is a world-class expert on the diagnosis and treatment of cancer who is eminently qualified to expound on the fundamentals of medical practice in this area. He cannot be too qualified, as defendant contends, to testify against a homeopath. Indeed, there is nothing in the record to suggest that his testimony was anything other than measuring defendant's conduct against the applicable standards of basic medical care. It is his knowledge of the minimum accepted procedure of diagnosis and treatment that counts, not his knowledge of the rudiments of old-time homeopathy. *King, supra,* 50 Ohio App.3d at 87, 553 N.E.2d at 704.

---

have taken over his care, knowing that a prior x-ray, you should have sent him out for a follow-up to see whether the pneumonia had cleared for his lungs?" A. "It would have been good." Defendant admitted that he " * * * should have referred this man in June when he was coughing up blood."

■ Defendant next makes the argument that Dr. Weiss's testimony on proximate cause was insufficient to even go to the jury. As outlined above, Dr. Weiss concluded from the available January and February X-rays done by Dr. Lee and the other facts of the case that Wayne Lambert was in Stage I cancer, the most curable type, when he went to defendant's office in February 1988. Dr. Weiss said that had defendant followed accepted medical practice and referred the patient for an X-ray and bronchoscopy, it is more likely than not that Lambert would have survived the lung cancer. He said that persons diagnosed in Stage I cancer have a sixty-five to seventy percent chance of surviving if appropriate treatment follows. Defense counsel cross-examined Dr. Weiss about this and got him to admit that there was no way to know for certain whether Lambert would have fallen within the sixty-five percent group of survivors or the thirty-five percent group of nonsurvivors.

■ In Ohio, there is no recovery in wrongful death for the loss of *any* chance of survival on account of medical malpractice. *Williams v. Grant* (1979), 65 Ohio App.2d 225, 19 O.O.3d 168, 417 N.E.2d 586. Rather, there must be sufficient evidence to show that with proper diagnosis, treatment, and surgery, the patient probably would have survived. *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St.2d 242, 56 O.O.2d 146, 272 N.E.2d 97 (expert's testimony that patient had a fifty percent chance of survival held insufficient). Though this rule has been severely criticized because it supposedly immunizes doctors against *bona fide* malpractice claims when a patient is seriously ill, this court is not at liberty to abandon the rule set forth by the Ohio Supreme Court. *Sherman v. Millhon* (June 16, 1992), Franklin App. No. 92AP–89, unreported, 1992 WL 142368 (dismissal proper where plaintiff had forty percent prognosis of surviving misdiagnosed lung cancer).

Dr. Weiss's survival statistics and testimony were inarguably sufficient evidence under the *Cooper* proximate cause test. Defense counsel's attempt to discredit Dr. Weiss by asserting that there was no way to know with certainty whether Lambert would have actually fallen within the sixty-five percent group of survivors makes no sense. Under *Cooper*, certainty is not required. Rather, a greater than fifty percent likelihood of survival is required. A less than one hundred, or more than zero, probability figure does not indicate any outcome with certainty. That is a mathematical principle of which we can be certain.

Further, Dr. Weiss's cancer statistics were the standard five-year figures developed through available research. They test only for five-year survivability and recurrence. Dr. Weiss did not speculate on whether Lambert would have been cancer-free for the rest of his days. Notwithstanding, *Cooper* requires proof only that the patient would have survived. It does not require a plaintiff to establish a definite period of survival. *Taylor v. C. Lawrence Decker, M.D., Inc.*

(1986), 33 Ohio App.3d 118, 121, 514 N.E.2d 754, 756 (evidence on life expectancy of untreated heart attack victim not required). It was incumbent on defendant to present evidence in mitigation of damages. *Miller v. Marrocco* (1989), 63 Ohio App.3d 293, 298, 578 N.E.2d 834, 837 (misdiagnosed lung cancer).

Nevertheless, we must conclude that there was at least an issue for the jury to be tried concerning proximate cause. The evidence is in conflict about when Wayne Lambert began spitting up blood, a symptom that would serve as a flag that cancer may be present. Lambert said he told defendant that he had been coughing up flecks of blood. However, this is not reflected in Dr. Lee's medical record. Moreover, this was not reflected in defendant's records until June 23, 1988. Indeed, defendant denies that Lambert ever told him about the blood until June 23. This is important because if defendant was not aware of the blood, then there would be less of a chance that cancer would be present. If that caused a delay in diagnosis until Lambert was in a later stage of incurable cancer, then the *Cooper* standard could not be satisfied. Dr. Weiss's testimony indicated that if there were a delay into March, for instance, then Lambert could have already fallen into a less curable type of cancer. Reasonable minds could reach differing conclusions on this issue. Hence, the jury should have been allowed to assess these facts.

Defendant's fourth assignment of error is not well taken and his fifth assignment of error is well taken.

■ Defendant's tenth assignment of error maintains that the trial court should not have directed a verdict in favor of plaintiff on the issue of contributory negligence. Similarly, defendant's eleventh assignment of error contends that trial court should have instructed the jury on the issue.

Understandably, defendant testified that there was nothing about him or his practice that would indicate to anyone that he was unqualified to practice or that his treatments were fraudulent. This is emphatically not a case in which a patient, knowing that he is terminally ill, seeks and assumes the risks of last-chance experimental or alternative treatment.

Defendant did testify that Wayne Lambert was a difficult patient. For instance, when plaintiff came in with his 103° fever, constant hacking cough, and otherwise diminished by his sickness, he gave a history which defendant characterized as "vague." While he told defendant he was seen by another doctor and got a diagnosis of acute pneumonia through X-rays, defendant said Lambert refused to disclose the name of his previous physician. Defendant described him as "very secretive" and nonresponsive to his questions. But he accepted him as such because he said "[w]e don't kick people out. We try to help."

Defendant said he thought Lambert feared cancer. He further said he thought Lambert would not go to a cancer specialist. In essence, he claimed that Lambert was a "very difficult patient" who "was running his own case." He never testified how this worsened Lambert's chances in relation to his own practice.

Ohio law recognizes the defense of contributory negligence in medical malpractice cases. *Bird v. Pritchard* (1973), 33 Ohio App.2d 31, 62 O.O.2d 96, 291 N.E.2d 769. While such negligence can serve to diminish recovery under modern comparative negligence principles, it is patently clear that such negligence must be contemporaneous with the malpractice of the physician. *Id.; McKoy v. Furlong* (1990), 69 Ohio App.3d 62, 65, 590 N.E.2d 39, 41 (failure to give accurate medical history in breast cancer case). Hence, it is improper to suggest, as defendant did at trial, that the negligent conduct of the patient prior to coming under the care of the defendant physician could serve to constitute negligence. Defendant cannot claim that Wayne Lambert caused or contributed to his own death by smoking for thirty years before seeing defendant. Sick people deserve the same care whether they smoke, drink, drive too fast, or engage in socially unacceptable behavior. *Matthew v. Williford* (Fla.App.1975), 318 So.2d 480 (patient ignored other doctors' warnings to stop smoking, lose weight, and go to hospital for evaluation of chest pains and nausea).

While intentional, material misrepresentations and disregarding doctor's orders can establish patient negligence, see *Sorina v. Armstrong* (1990), 68 Ohio App.3d 800, 589 N.E.2d 1359, courts have repeatedly recognized that physicians have superior skill and knowledge which patients rely on in a context of trust and confidence, giving rise to special fiduciary duties.[9]

In the present case, we find that defendant accepted Wayne Lambert for treatment as he was and cannot point to anything Lambert did which could constitute contemporaneous negligence. In seeking a second opinion, Lambert was not required to lay out all of his prior physician's analyses. That would defeat one of the essential purposes of a second opinion. Moreover, defendant has absolutely no right to rely, as he admittedly does, on a prior physician's diagnosis unless the patient gives informed consent to such practice. Further, the fact that Lambert may have feared cancer, which comes to many people's

---

9. See, generally, Comment, Contributory Negligence in Medical Malpractice: Are the Standards Changing to Reflect Society's Growing Health Care Consumerism? (1991), 17 U. Dayton L.Rev. 151. Our answer to the author's rhetorical question is that we think not. Though health care costs are a growing societal problem, we see no efficacy in the judiciary requiring patients, in an increasingly complex and specialized area of knowledge, to second-guess trained and regulated professionals which they have every right to and do rely on.

minds during even the slightest evidence of illness, does not diminish defendant's obligation of ruling out that fear in accordance with sound medical practice.

██ Plainly, defendant did not provide any expert testimony establishing that Lambert's failure to disclose facts or his other actions impeded proper diagnosis and care.[10] Medical experts must testify that the proximate effect of plaintiff's negligence aggravated the relevant medical condition. *Barton v. Owen* (1977), 71 Cal.App.3d 484, 505, 139 Cal.Rptr. 494, 506. The only exceptions are those very rare instances when it would be obvious to any layman that the physician's care would be negligent. See *Champs v. Stone* (1944), 74 Ohio App. 344, 29 O.O. 488, 58 N.E.2d 803 (patient permitted obviously intoxicated physician to perform injection on him).

Defendant felt that " * * * most patients are pretty knowledgeable, * * * they know what's the matter with them when they come into our place for treatment to get well." Despite this sentiment and his feeling that Lambert was running the case, defendant could not place the burden on his patient, who was not skilled in the medical arts, to diagnose himself. Cf. *Nimmer v. Purtell* (1975), 69 Wis.2d 21, 230 N.W.2d 258 (osteopath could be guilty of malpractice on himself by directing the actions of the osteopath treating him).

There was no issue of contributory negligence to go to the jury in this case. Defendant's tenth and eleventh assignments of error are meritless.

## V. Improper Verdict

Defendant's thirteenth and fourteenth assignments of error claim that there was insufficient evidence of damages and that the jury's verdict was the result of passion and prejudice through introduction of prejudicial error. Because of our disposition of the twelfth assignment of error below, we cannot and need not review the sufficiency of the evidence of damages presented by plaintiff. Further, our discussion concerning the first assignment of error and the potential taint from improper arguments regarding punitive damages leads us to conclude that the award was influenced by prejudicial error.

Defendant's thirteenth assignment of error is not well taken but defendant's fourteenth assignment of error is well taken to the extent that the issue of punitive damages was improperly introduced in this case.

---

**10.** Indeed, though Lambert continued smoking after he was finally diagnosed with lung cancer, there was no evidence that this subsequent patient action aggravated his condition or contributed to his demise. Dr. Weiss said that this would not have any bearing on the misdiagnosed cancer. While it could cause a new, and independent cancer, there was no evidence of this here.

■ Defendant's twelfth assignment of error asserts that the form of the verdict was improper in this wrongful death and survivorship action. Though he did not object, defendant contends that the general verdict of $2.4 million did not separate the plaintiff's wrongful death claim from the decedent's survivorship claim, thus resulting in an unenforceable and unassailable verdict. We agree.

■ In *White v. Moody* (1988), 51 Ohio App.3d 16, 24, 554 N.E.2d 115, 123, this court recognized that actions like this one for wrongful death and survivorship should be rendered on separate verdict forms, but we declined to consider whether it was plain error for the trial court to fail to ensure that a proper verdict was rendered. We resolve that issue today and hold that, because of the adverse effect on the proceedings and the administration of the law, it is a manifest miscarriage of justice when a trial court fails to ensure that a proper verdict is rendered in such actions. Cf. *Miller v. Marrocco, supra,* 63 Ohio App.3d at 298, 578 N.E.2d at 837 (plain error to send conflicting verdict forms to jury in wrongful death case).

Defendant's twelfth assignment of error is well taken.

## VI. Motion for a New Trial

Defendant's fifteenth assignment of error argues that the trial court should have granted his unopposed motion for a new trial. Since we held that the foregoing verdict was improper, we must accept this assignment of error on that basis. The trial court should conduct a new trial on proximate cause and damages with proper verdict forms.

Defendant's fifteenth assignment of error is well taken.

For the foregoing reasons, defendant's first, fifth, eighth, twelfth, fourteenth, and fifteenth assignments of error are sustained. The remaining assignments of error are overruled. The court is instructed to conduct a new trial on the proximate cause and damages issues in conformity with this opinion and in accordance with law.

*Judgment reversed*
*and cause remanded*
*with instructions.*

McCORMAC and DESHLER, JJ., concur.

## APPENDIX

### Assignments of Error

"I. The trial court erred in permitting plaintiff's counsel, over objection, to make repeated references to and requests for punitive damages to the jury when

the complaint failed to allege conduct or circumstances giving rise to punitive damages and contained no demand for punitive damages.

"II. The trial court plainly erred in failing to expressly caution the jury that they were not to award punitive damages.

"III. The trial court erred in permitting plaintiff's expert witness, Raymond Weiss, M.D., to express speculative opinions regarding Wayne Lambert's life expectancy and hypothetical rate of cure from cancer.

"IV. The trial court erred in overruling defendant's motion for a directed verdict.

"V. The trial court erred in granting plaintiff's motion for a directed verdict.

"VI. The trial court erred in permitting Dr. Weiss to answer repeated leading and inflammatory questions during the course of his direct testimony.

"VII. The trial court erred in permitting Dr. Weiss to express disparaging opinions regarding the nature and efficacy of the practice of homeopathy without any foundation or qualification therefor.

"VIII. The trial court erred in refusing to permit defense counsel to inquire as to the rate of compensation paid by plaintiff to Dr. Weiss in connection with his testimony.

"IX. The trial court erred in permitting Dr. Weiss, a non-treating physician, to summarize and comment on Wayne Lambert's course of illness and treatment.

"X. The trial court erred in withdrawing the issue of contributory negligence from the jury.

"XI. The trial court erred in refusing to give defendant's requested instructions to the jury.

"XII. The trial court erred in submitting survival and wrongful death claims to the jury upon a single verdict form that permitted only one award.

"XIII. The trial court erred in submitting the issue of damages to the jury when the evidence on that issue was legally insufficient.

"XIV. The trial court erred in entering judgment upon a verdict which was improper in form and contrary to the law and the evidence.

"XV. The trial court erred in overruling defendant's unopposed motion for a new trial."