OPINION
{¶ 1} Appellants, Dr. Gregory McDaniel and Comprehensive Pediatric and Adult Medicine, appeal the judgment of the trial court entered on a jury verdict in the Mahoning County Court of Common Pleas in favor of Appellee, Lisa Mullins, Administratrix of the Estate of Charles Jeffrey Mullins ("Mr. Mullins").
 {¶ 2} Appellants contend that the trial court abused its discretion by refusing to instruct the jury on the alleged comparative negligence of Appellee and Mr. Mullins. Likewise, Appellants assert that their motion for new trial based upon the trial court's failure to instruct the jury on comparative negligence should have been granted. Appellants further argue that the trial court abused its discretion by excluding Appellants' original expert witness due to a conflict of interest. Finally, Appellants challenge the trial court's award of prejudgment interest.
 {¶ 3} Appellants correctly argue that the trial court should have instructed the jury on Appellee's alleged comparative negligence. In this case, it appears that Appellee voluntarily assumed a duty of care and Mr. Mullins reasonably relied on that assumption. Whether Appellee breached that duty turns on conflicting evidence elicited at trial. As a consequence, the trial court's refusal to give the comparative negligence instruction was unreasonable and contrary to law. The trial court's decisions with respect to the absence of comparative negligence on the part of Mr. Mullins, the disqualification of Appellants' first expert witness, and the award of prejudgment interest are supported by the evidence and Appellants' arguments to the contrary are without merit.
 Facts *Page 2 {¶ 4} Mr. Mullins and Appellee met in March of 2002, and were married on August 24, 2002. (Trial Tr., p. 160.) When they met, Mr. Mullins lived in Ohio and Appellee lived in Texas. During their courtship, the couple spent only 24 days together in the same town, but spoke on the phone everyday. (Trial Tr., pp. 200-201.)
 {¶ 5} A few months into the marriage, Appellee began to suspect that Mr. Mullins was addicted to drugs. (Trial Tr., pp. 162-163.) Before they were married, Mr. Mullins told Appellee that he had a problem with drugs in the past and had received treatment for drug addiction at Glenbeigh. (Trial Tr., p. 202.)
 {¶ 6} Appellee testified that after several confrontations, Mr. Mullins acknowledged his continuing drug problem and sought medical treatment for his addiction from his primary care physician, Dr. Maged Awadalla. (Trial Tr., p. 163.) According to Appellee, Dr. Awadalla prescribed Librium 25mg, four times a day to treat Mr. Mullins. (Trial Tr., p. 164.) However, Dr. Awadalla testified that he prescribed Librium to control Mr. Mullins' anxiety; not to treat his drug addiction. (Trial Tr., p. 840.)
 {¶ 7} Appellee accompanied Mr. Mullins to his appointment with Dr. Awadalla on September 16, 2002. (Trial Tr., p. 839.) This appointment is the first where Dr. Awadalla's medical records reflect that Mr. Mullins reported that he was abusing drugs. At that appointment, Dr. Awadalla reduced Mr. Mullins' Librium dosage to 25mg, two times a day. (Trial Tr., p. 840.) At an appointment on September 23, *Page 3 
2002, Mr. Mullins told Dr. Awadalla that he was only taking one Librium 25mg at night. (Trial Tr., p. 842.)
 {¶ 8} At some point prior to Mr. Mullins' confession to Dr. Awadalla about his drug addiction, Dr. Awadalla had referred him to a psychiatrist, Dr. Nefertitti Labib, to treat his bipolar disorder. (Trial Tr., p. 835.) However, in late October, Dr. Labib's office notified Dr. Awadalla's office that Mr. Mullins' case had "too many issues" and that Dr. Labib was referring him to Psycare. (Trial Tr., pp. 836, 842-843.) According to Appellee, Mr. Mullins refused to consider inpatient treatment because he had tried it twice before and claimed that all he derived from the experiences were more drug connections. (Trial Tr., pp. 164-165.)
 {¶ 9} Mr. Mullins' last appointment with Dr. Awadalla was November 21, 2002. Dr. Awadalla's medical records reflect that Mr. Mullins complained that he had been dizzy and had vomited for three days. Dr. Awadalla testified that he "decided to give him Librium 25 milligrams twice a day." (Trial Tr., p. 843.)
 {¶ 10} After many family discussions regarding the best way to address Mr. Mullins' drug problem, his mother encouraged him to see her primary care physician, Dr. Christopher Economus. (Trial Tr., p. 165.) The Mullinses saw Dr. Economus on Friday, November 22, 2002. (Trial Tr., pp. 250, 271, 289.) Mr. Mullins provided the following list of medical problems to Dr. Economus: chemical dependency, bipolar disorder, depression, and alcoholism. (11/22/02 Economus Medical Records, p. 4.) Dr. Economus testified that Mr. Mullins never complained of any chronic pain during his exam. (Trial Tr., p. 259.) After a detailed account of Mr. Mullins' history of drug *Page 4 
abuse, Dr. Economus concluded that he did not have the expertise necessary to treat Mr. Mullins. (Trial Tr., p. 268.)
 {¶ 11} Although Dr. Economus encouraged Mr. Mullins to seek inpatient treatment, Mr. Mullins refused. (Trial Tr., pp. 279-280.) As a consequence, Dr. Economus referred Mr. Mullins to Dr. Gregory McDaniel. Dr. McDaniel had provided Methadone therapy to the husband of one of Dr. Economus' employees following his initial treatment at a Methadone Clinic. (Trial Tr., p. 257.) Dr. Economus referred Mr. Mullins to Dr. McDaniel for possible Methadone treatment to address his drug addiction. (Trial Tr., pp. 265-266.)
 {¶ 12} Dr. Economus prescribed Lexapro 10mg, and instructed Mr. Mullins to stop taking the Librium prescribed by Dr. Awadalla. (11/22/02 Economus Medical Records, p. 5.) Also, in order to prevent symptoms of withdrawal prior to Mr. Mullins' appointment with Dr. McDaniel, Dr. Economus gave Mr. Mullins four Oxycontin 80mg pills, with instructions to take one pill per day. (Trial Tr., p. 280.)
 {¶ 13} Four days later, on Tuesday, November 26, 2002, the Mullinses saw Dr. McDaniel. According to Appellee, Mr. Mullins requested treatment from Dr. McDaniel exclusively for his addiction to narcotics. (Trial Tr., p. 180.) Dr. McDaniel's medical records list "drug abuse" as Mr. Mullins' chief complaint. The records read:
 {¶ 14} "WM [WITH] BIPOLAR, ALCOHOLISM
OXYCONTIN ADDICTION. IN `AA' OFF/ON.
AGE 22 ALCOHOL `WEEKEND ALCOHOLIC
OXYCONTIN 3 YRS (MOTORCYCLE RACER — A LOT INJURIES) *Page 5 
IN PAIN KNEES ((L) ACL SURGERY 1990)
EVENTUALLY CHEWING OXYCONTIN, UP TO 8 80mg/DAY
IN GLEN BAY [SIC] — 3 WEEKS AFTER OUT. UP TO
7 80's/DAY NEIL KENNEDY 3 DAYS DETOX 
DID OK FOR 2 WKS CRAVINGS — GOT BACK ON OXY
(8-10 MOS AGO)
CURRENTLY 90 NORCO/OVER WEEKEND IF
CANT GET OXY
SICK LEAVE
NAUSEA. WEAK" (11/26/02 McDaniel Medical Records, p. 2.)
 {¶ 15} Dr. McDaniel, however, testified that Mr. Mullins sought medical treatment for chronic intolerable pain as well as addiction. (Trial Tr., p. 340.) According to Dr. McDaniel, Mr. Mullins became addicted to pain medication after taking opiates prescribed for a litany of injuries that he suffered in his twenties and thirties. (Trial Tr., pp. 346, 361.)
 {¶ 16} Dr. McDaniel's records do not document any complaints of chronic pain by Mr. Mullins. Dr. McDaniel explained that he did not record Mr. Mullins' complaints of chronic pain because he chose instead to list Mr. Mullins' injuries, in order to document that his addiction began when he had a legitimate reason for taking pain medication. (Trial Tr., pp. 364-366.) Appellee denied that Dr. McDaniel was treating Mr. Mullins for chronic pain. (Trial Tr., pp. 182, 185.) *Page 6 
 {¶ 17} Dr. McDaniel performed only a cursory examination of Mr. Mullins, which he conceded did not reveal any evidence of chronic pain. (Trial Tr., p. 357.) Dr. McDaniel did not order any diagnostic studies or tests to determine the source or degree of Mr. Mullins' pain. (Trial Tr., p. 347.) Dr. McDaniel testified that Mr. Mullins told him that he had already undergone diagnostic testing for pain with his previous physicians, however, Dr. McDaniel did not request copies of the other treating physicians' records. (Trial Tr., pp. 342-343.)
 {¶ 18} Dr. McDaniel explained, "in someone like [Mr. Mullins] that was taking that much medication I'd be extremely surprised that he would have pain because he had way more narcotics in his system than most people." (Trial Tr., p. 359.) When asked whether he believed that Mr. Mullins suffered from chronic intractable pain, Dr. McDaniel responded, "[t]he fact of the amount of medication he was taking I would say yes." (Trial Tr., pp. 361-362.)
 {¶ 19} Dr. McDaniel did not order a toxicology screen for Mr. Mullins, relying instead on Mr. Mullins' account of his recent drug abuse. (Trial Tr., p. 354.) Dr. McDaniel explained that, because Mr. Mullins was neither high nor in withdrawal, he did not believe that a serum tox screen would be informative. (Trial Tr., pp. 349-350.) He further stated, "the other reason I did not feel [a drug screen] was appropriate is as I said he could have left my office an hour after he saw me, taken Librium or some other drug that he had at home to take and that drug screen would have been totally default. It would have been useless." (Trial Tr., p. 734.) *Page 7 
 {¶ 20} Dr. McDaniel testified that Methadone was his only choice for treating pain in drug-addicted patients because it provides pain relief without the euphoric effect of other pain medications like Oxycontin and Percocet. (Trial Tr., p. 676.) He further testified that a single daily dose would not effectively control Mr. Mullins' pain, because, "the pain effect of Methadone does not last as long as the Methadone that's in the system." (Trial Tr., p. 679.) As a consequence, Dr. McDaniel "split up" the dosage so that Mr. Mullins would take Methadone four times a day. (Trial Tr., p. 679.)
 {¶ 21} Ultimately, Dr. McDaniel calculated the prescribed amount of Methadone based upon Mr. Mullins' statement that he had taken 90 Norcos over the previous weekend. Norco is a prescription pain medication which combines Tylenol and hydrocodone. (Trial Tr., p. 678.)
 {¶ 22} Dr. McDaniel testified that a physician must treat a drug-addicted patient with an equivalent form of what they are taking illegally, otherwise they will go into withdrawal. He further testified that, "[drug-addicted patients] are going to have a much higher risk of abusing drugs they probably have at home already." (Trial Tr., p. 676.) However, Dr. McDaniel conceded that opiate withdrawal is not lethal. (Trial Tr., p. 343.)
 {¶ 23} Based upon Mr. Mullins' confession regarding the Norco, Dr. McDaniel undertook the following calculation:
 {¶ 24} "There's tables as [Appellee's expert, Dr. Edwin Salsitz] had mentioned that allow you to convert between different opioids. And basically Norco is *Page 8 
hydrocodone which is similar to Vicodin or a different drug company. And if you look at Methadone is kind of the basis they use is Phentanol. So Methadone is considered 20 whereas hydrocodone is considered 30. If he took 90 Norco that's 90 times 7.5 which is 675 milligrams.
 {¶ 25} "* * *
 {¶ 26} "And so I just calculated a total dose over three days of hydrocodone that he had stated that he took and then converted that into the amount of milligrams of Methadone that would be, which I used a simple algebra equation which I don't think we need to get into details which would equal actually 150 milligrams of Methadone per day or 450 milligrams of Methadone for that weekend. Despite Dr. Salsitz had had a book that said you were supposed to decrease the dose by 90 percent, the book that I'm using doesn't mention that. But for practice what I have learned is you would cut the dose by 25 to 50 percent. So if it was 150 milligrams in a day, if you take half that it would be 75. You can't really dose 75 milligrams of Methadone because it's 10 milligrams, so I went with 80 milligrams which was within 25, 50 percent decrease in the dose." (Trial Tr., pp. 677-679.)
 {¶ 27} Dr. McDaniel acknowledged that federal law prohibits physicians from prescribing Methadone solely for the treatment of opiate addiction, but that physicians can legally dispense Methadone for the treatment of chronic pain. (Trial Tr., pp. 336, 452-453, 714-715.) When asked on cross-examination why he chose to document Mr. Mullins' injuries rather than his alleged complaints of chronic pain, Dr. *Page 9 
McDaniel stated, "I don't treat solely addicts so this is the kind of information I needed to justify my use of Methadone in this case." (Trial Tr., p. 344.)
 {¶ 28} Dr. McDaniel is an internist with no special training or certification in pain management or narcotics addiction. (Trial Tr., pp. 360-361, 702.) Despite his lack of certification, Dr. McDaniel testified that he had a wealth of experience because his training as an internist often included prescribing narcotic medication for patients who suffered from chronic pain. (Trial Tr., p. 361.)
 {¶ 29} Dr. McDaniel characterized Mr. Mullins as a "ticking time bomb," and stated that his initial appointment with Mr. Mullins may have been his only opportunity to treat him. (Trial Tr., p. 675.) Dr. McDaniel testified that Mr. Mullins' situation was an urgent one, because some addicts change their minds after their initial visit and never return for treatment. Dr. McDaniel stated that he, "felt comfortable treating [Mr. Mullins]," as an outpatient because Appellee was, "willing to participate and take control of the medications so that even if he was tempted to he couldn't take more than he was supposed to * * *." (Trial Tr., p. 683.)
 {¶ 30} Dr. McDaniel prescribed a seven-day supply of Methadone for Mr. Mullins and scheduled a follow-up visit in one week. Dr. McDaniel cautioned Mr. Mullins that he would discontinue his treatment if he discovered that Mr. Mullins was changing his prescription, going to another doctor for pain medication, or using any illegal medications. (Trial Tr., pp. 682-683.)
 {¶ 31} Mr. Mullins filled the prescription and took his first 20mg dose of Methadone the following morning, but he subsequently became ill and vomited. *Page 10 
(Trial Tr., p. 187.) Appellee called Dr. McDaniel's office and informed his nurse that Mr. Mullins had vomited after taking the pills. (Trial Tr., p. 187.)
 {¶ 32} According to Appellee, Dr. McDaniel's nurse told her to give Mr. Mullins another dose of Methadone — 30mg instead of 20mg, but Mr. Mullins vomited the second dose just as he had the first dose. (Trial Tr., p. 187.)
 {¶ 33} Appellee called Dr. McDaniel's office again and Dr. McDaniel prescribed Phenergan 20mg suppositories to control Mr. Mullins' nausea. Pursuant to Dr. McDaniel's orders, Appellee gave Mr. Mullins a suppository and another 30mg dose of Methadone. However, Mr. Mullins passed the suppository and vomited the pills.
 {¶ 34} According to Dr. McDaniel, he prescribed the Phenergan after Mr. Mullins vomited the first dose of Methadone. (Trial Tr., p. 684.) Dr. McDaniel explained that he decided to immediately re-dose Mr. Mullins with another 20 milligrams of Methadone because Appellee told him that the pills were visible in the emesis. (Trial Tr., pp. 685-686.) Dr. McDaniel left the office early that day as he was travelling to New York for the Thanksgiving holiday. He received a page through his answering service advising him that the suppository caused Mr. Mullins to move his bowels, and that Mr. Mullins had vomited the second 20mg dose of Methadone. (Trial Tr., p. 687.)
 {¶ 35} Dr. McDaniel then told Appellee to give Mr. Mullins another suppository and to wait approximately one hour. In an hour, if Mr. Mullins could hold down water, Appellee was to give Mr. Mullins another dose of Methadone. Appellee testified that *Page 11 
Dr. McDaniel's office told her to give Mr. Mullins 20mg of the drug. According to Dr. McDaniel, he was concerned at that point that Mr. Mullins was starting to experience symptoms of withdrawal, so he advised Appellee to increase the dosage to 30mg of Methadone.
 {¶ 36} Mr. Mullins was able to hold down the final dose of Methadone (his fourth dose according to Appellee, and third dose according to Dr. McDaniel), and shortly thereafter he fell asleep. (Trial Tr., p. 191.) Because Mr. Mullins had told Appellee that he was feeling better, Appellee left the house to do some last minute food shopping for Thanksgiving, which was the next day. (Trial Tr., p. 191.) Dr. McDaniel called back to determine if Mr. Mullins had tolerated the 30mg dosage, but no one answered the telephone at the Mullins' residence. (Trial Tr., pp. 687-688.)
 {¶ 37} Appellee returned home from shopping and discovered that Dr. McDaniel had called. (Trial Tr., pp. 192-193.) When she returned his call, Dr. McDaniel informed her that he was on his way out of town for the holiday, but planned to stop at Walgreens to give the pharmacist another Methadone prescription for Mr. Mullins.
 {¶ 38} However, he called her back a short time later to tell her that the pharmacist had advised him that he could not prescribe any more Methadone for Mr. Mullins without seeing him first, because Methadone was a regulated drug. (Trial Tr., p. 193.)
 {¶ 39} During the conversation, Appellee told Dr. McDaniel that Mr. Mullins was sleeping soundly and that she could hear him snoring. (Trial Tr., p. 195.) *Page 12 
Appellee told Dr. McDaniel that Mr. Mullins was breathing a little fast, which, according to Dr. McDaniel, ruled out any respiratory depression. (Trial Tr., p. 688.) Appellee told Dr. McDaniel that Mr. Mullins was difficult to arouse, but that he had not slept the night before and was normally difficult to arouse. She promised Dr. McDaniel that she would check on Mr. Mullins regularly.
 {¶ 40} Dr. McDaniel's final phone call to Appellee was at 6:09 p.m. Appellee informed Dr. McDaniel that she still could not arouse Mr. Mullins. Because there was no evidence of slow breathing, Dr. McDaniel told Appellee to continue to watch Mr. Mullins closely, and, if Mr. Mullins' status did not change in an hour, Dr. McDaniel instructed Appellee to take him to the hospital. (Trial Tr., p. 690.) Although Appellee testified that Dr. McDaniel never told her to take Mr. Mullins to the hospital if she could not arouse him by 7:00 p.m., her counsel documented those instructions in his introductory letter to Dr. Salsitz, Appellee's expert. (Trial Tr., pp. 489-490.)
 {¶ 41} After speaking with Appellee, Dr. McDaniel called the internist who was covering for him that day to advise him of Mr. Mullins' condition and to let him know that he might be receiving a call from the emergency room. (Trial Tr., p. 691.)
 {¶ 42} Dr. McDaniel testified that Mr. Mullins would have likely survived if Appellee had followed his instructions and taken Mr. Mullins to the hospital. (Trial Tr., p. 693.) Dr. Salsitz agreed that early intervention would have improved Mr. Mullins' chances of survival. (Trial Tr., p. 491.)
 {¶ 43} Between 11:00 and 11:30 p.m., Appellee attempted to awaken Mr. Mullins in order to move some furniture to prepare for their Thanksgiving celebration *Page 13 
the next day. (Trial Tr., p. 196.) Mr. Mullins was non-responsive. When Appellee turned him over, she discovered that he had vomited. She called emergency services, but they were unable to revive Mr. Mullins.
 {¶ 44} At the request of the coroner's office, Appellee turned over the remaining Methadone pills. (Trial Tr., p. 197.) There were ten pills missing from the bottle, which is consistent with Appellee's account of the day's events. Dr. McDaniel stated that Appellee did not follow his instructions if there were ten missing pills. (Trial Tr., pp. 394-395.) Dr. McDaniel's medical records reveal that his notes regarding the events of November 27, 2002 were recorded on December 2, 2002. (11/27/02 McDaniel Medical Records.)
 Cause of Death {¶ 45} The coroner ruled that the cause of Mr. Mullins' death was acute intoxication by the combined effects of Methadone and Nordiazepam. (Trial Tr., p. 467.) The Toxicology Lab Report states that Mr. Mullins had .75mg of Methadone and .24mg of Nordiazepam in his bloodstream. Although Mr. Mullins also had .15mg of Oxycodone in his bloodstream, the coroner's ruling did not attribute Mr. Mullins' death to the Oxycodone in his system.
 {¶ 46} Appellee's medical expert explained that when the liver breaks down medication, it creates new chemical metabolites. (Trial Tr., p. 468.) Nordiazepam is a metabolite of Benzodiazepines. Although Librium is a Benzodiazepine, Dr. Salsitz stated that it is impossible to tell which specific Benzodiazepine was in Mr. Mullins' system. (Trial Tr., pp. 468-469.) However, Dr. Salsitz testified that the Nordiazepam *Page 14 
in Mr. Mullins' toxicology screen was likely a metabolite of the final dose of Librium Mr. Mullins took prior to his appointment with Dr. Economus:
 {¶ 47} "Q Earlier in your examination by me we talked about Librium that was prescribed on November 21 by Dr. Awadalla, [Mr. Mullins'] family doctor. Do you have an opinion as to whether this level you referred to of Nordiazepam could have been a residual amount of Librium that he had taken four days before seeing Dr. McDaniel?
 {¶ 48} "A My opinion is that it definitely could because Librium is a long-acting drug. That's one of the reasons it's used in certain situations. And the other thing is that we don't know anything about Mr. Mullins' liver function, his ability to metabolize drugs. And with all the alcohol he may have had impaired his liver function and metabolized drugs slower leading to a longer duration or excretion of the drug and the metabolites. So I think that that's perfectly compatible with this being the Librium from a few days ago." (Trial Tr., p. 470.)
 {¶ 49} Dr. Salsitz further testified that, had Dr. McDaniel given Mr. Mullins a urine screen prior to prescribing Methadone, the screen would have revealed the presence of Nordiazepam in Mr. Mullins' system. (Trial Tr., pp. 470-471.)
 {¶ 50} Dr. McDaniel essentially conceded that the Nordiazepam in Mr. Mullins' toxicology screen was the Librium prescribed by Dr. Awadalla, but he testified that he would have prescribed Methadone even if Mr. Mullins still had Librium in his system. Dr. McDaniel stated, "I've explained before if he had taken Librium up until Friday *Page 15 
Librium might be on his drug screen. * * * It's not going to keep me from giving him Methadone." (Trial Tr., p. 734.)
 {¶ 51} Although Dr. McDaniel admitted that the Nordiazepam in Mr. Mullins' system could have been a residual amount of Librium from the Awadalla prescription, he speculated that it was also possible, based upon Mr. Mullins' history of drug abuse, that he took Librium or another Benzodiazepine after he left his office. (Trial Tr., pp. 734, 736.)
 Expert Testimony {¶ 52} Dr. Salsitz testified that Dr. McDaniel's treatment demonstrated a breach of the duty of care of a treating physician for a number of reasons. First, Dr. Salsitz testified that Mr. Mullins presented a complicated case, and Dr. McDaniel did not conduct standard testing procedures or take a thorough family history. (Trial Tr., pp. 446-447.) In addition to a toxicology screen, Dr. Salsitz would have required a liver test in order to determine drug metabolism and other interactions. (Trial Tr., p. 448.) He stated that Dr. McDaniel should have procured the records and the prescriptions of Mr. Mullins' other treating physicians. (Trial Tr., pp. 448-449.)
 {¶ 53} Dr. Salsitz also expressed grave concerns about prescribing Methadone outside of a clinical setting. He explained that Methadone, unlike other opioids, is an inherently long-acting drug, but its analgesic effects do not last as long as the drug lasts in the system. As a consequence, the drug accumulates in the body and a patient may experience sedation, respiratory depression, or death. (Trial Tr., p. 450.) *Page 16 
 {¶ 54} Dr. Salsitz testified that he did not believe that the medical records in this case substantiated Dr. McDaniel's claim that Mr. Mullins suffered from chronic intolerable pain. (Trial Tr., p. 456.) Therefore, Dr. Salsitz would have started Mr. Mullins' treatment with 30-40 milligrams of Methadone a day, which is consistent with the federal regulations governing dosage by Methadone clinics. (Trial Tr., p. 457.) Dr. Salsitz cited guidelines that limit pain patients to 30mg of Methadone on the first day. He stated that the axiom "start low and go slow" is the product of 40 years of experience in Methadone work by some of the original leaders in Methadone therapy. Dr. Salsitz testified that, because Methadone accumulates in the body, a treating physician should wait four or five days to determine whether a dose of Methadone is adequate. (Trial Tr., pp. 458-459.)
 {¶ 55} Dr. Salsitz also underscored the pronounced lack of cross-tolerance associated with Methadone. (Trial Tr., p. 483.) Reading from a textbook, entitled "Substance Abuse, A Comprehensive Textbook," Dr. Salsitz stated:
 {¶ 56} "[W]hen switching drugs reduce the equianalgesic dose of a new drug by 25 to 50 percent to account for incomplete cross-tolerance. The only exception to this is Methadone which appears to manifest a greater degree of incomplete cross-tolerance than other opioids — than other opioids. When switching to Methadone reduce the equianalgesic dose by 90 percent." (Trial Tr., p. 485.)
 {¶ 57} Dr. Salsitz was especially suspect of Dr. McDaniel's use of the equianalgesic dosing tables in treating a drug-addicted patient. Dr. Salsitz explained that the tables are intended to convert the dosage of patients who are stable on an *Page 17 
opioid for the treatment of a chronic, but monitored, problem. (Trial Tr., p. 548.) He stated that the tables were never intended to be used for the acute treatment of somebody who has binged on 90 Norcos over one weekend.
 {¶ 58} Furthermore, Dr. Salsitz questioned Dr. McDaniel's reliance on Mr. Mullins' statement that he took 90 Norcos. He characterized drug addicts like Mr. Mullins as "unreliable historian[s]" and testified that Dr. McDaniel should have confirmed his claim with the actual prescriptions. (Trial Tr., p. 531.) He said that drug-addicted patients often stretch the truth regarding their drug intake in order to get more medication from a drug treatment facility.
 {¶ 59} Finally, Dr. Salsitz testified that Mr. Mullins' inability to tolerate the Methadone was a red flag which should have prompted Dr. McDaniel to discontinue outpatient treatment in favor of an office or an emergency room visit. (Trial Tr., p. 459.) He stated that a rapid respiratory rate is as grave a concern as a low rate, and that Mr. Mullins' rapid breathing should have prompted Dr. McDaniel to direct Appellee to get him to a physician. (Trial Tr., pp. 464-465.)
 {¶ 60} Overall, Dr. Salsitz criticized Dr. McDaniel's rush to treatment. He testified that chronic intractable pain is, "really a complicated big time kind of diagnosis," and that combined with Mr. Mullins' psychiatric problems, is not something a physician should have attempted to, "resolve[ ] or fix[ ] on the Tuesday of a Thanksgiving day weekend." (Trial Tr., p. 487.)
 {¶ 61} Appellants' expert, Dr. Christopher Adelman acknowledged that Methadone was the most highly regulated drug in history and one of the most *Page 18 
misunderstood addiction treatments. (Trial Tr., p. 950.) He stated that, "[i]n an ideal world," it would have been "nice" to have, "every blood test that exists" prior to prescribing Methadone, but that is not reasonable and would not have changed the treatment. (Trial Tr., pp. 918-919.) He characterized the 80mg dosage of Methadone as an appropriate dose based upon the 90 Norcos that Mr. Mullins consumed the previous weekend. (Trial Tr., p. 916.) Like Dr. McDaniel, Dr. Adelman concluded that "start[ing] low and going slow" would have put Mr. Mullins in withdrawal, and likely sent him to the emergency room to be treated for dehydration. (Trial Tr., p. 919.)
 First Assignment of Error {¶ 62} "The trial court abused its discretion by failing to submit Appellants' proposed jury instruction regarding comparative negligence."
 {¶ 63} Appellants assert that the trial court should have instructed the jury on the alleged contributory negligence of Mr. Mullins and Appellee. To establish negligence on the part of Mr. Mullins, Appellants rely on Dr. McDaniel's observation that the Noradiazepam in Mr. Mullins' system could have been a by-product of Benzodiazepines that Mr. Mullins abused after Dr. McDaniel prescribed Methadone. To establish negligence on the part of Appellee, Appellants rely on Dr. McDaniel's testimony that Appellee ignored his instructions to take Mr. Mullins to the hospital if she could not awake him by 7:00 p.m.
 {¶ 64} When reviewing a trial court's jury instructions, an appellate court must determine whether the trial court's refusal to give a requested instruction constituted *Page 19 
an abuse of discretion under the facts and circumstances of the case.State v. Wolons (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140. (Internal citations omitted.) When applying the abuse of discretion standard, we may not substitute our judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621, 614 N.E.2d 748.
 {¶ 65} Generally, requested jury instructions should be given if they are a correct statement of the law as applied to the facts in a given case. Murphy v. Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585,575 N.E.2d 828. "[A] court's instructions to the jury should be addressed to the actual issues in the case as posited by the evidence and the pleadings." State v. Guster (1981), 66 Ohio St.2d 266, 271,421 N.E.2d 157.
 {¶ 66} "In reviewing a record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction."Feterle v. Huettner (1971), 28 Ohio St.2d 54, 275 N.E.2d 340 at syllabus.
 {¶ 67} "[A]n incomplete charge will constitute grounds for reversal of a judgment where the charge as given misleads the jury." Marshall v.Gibson (1985), 19 Ohio St.3d 10, 12, 482 N.E.2d 583, 585. In addition to being a correct statement *Page 20 
of the pertinent law, a charge, "should also be adapted to the case and so explicit as not to be misunderstood or misconstrued by the jury." Id., citing Aetna Ins. Co. v. Reed (1877), 33 Ohio St. 283, 295.
 {¶ 68} Causes of action accruing prior to April 9, 2003 are governed by the former comparative negligence statute, R.C. 2315.19, which provides in pertinent part:
 {¶ 69} "Contributory negligence or implied assumption of the risk of a person does not bar the person or the person's legal representative as complainant from recovering damages that have directly and proximately resulted from the negligence of one or more other persons, if the contributory negligence or implied assumption of the risk of the complainant or of the person for whom the complainant is legal representative was no greater than the combined negligence of all other persons from whom the complainant seeks recovery. However, any compensatory damages recoverable by the complainant shall be diminished by an amount that is proportionately equal to the percentage of negligence or implied assumption of the risk of the complainant or of the person for whom the complainant is legal representative, which percentage is determined pursuant to division (B) of this section." R.C. 2315.19(A)(2).
 {¶ 70} "Ohio law recognizes the defense of contributory negligence in medical malpractice cases." Lambert v. Shearer (1992),84 Ohio App.3d 266, 284, 616 N.E.2d 965, citing Bird v. Pritchard (1973),33 Ohio App.2d 31, 291 N.E.2d 769. A patient can be negligent if he disregards a physician's instructions. See, generally *Page 21 Sorina v. Armstrong (1990), 68 Ohio App.3d 800, 589 N.E.2d 1359. However, there must be some evidence or proof of a causal connection between the alleged contributory patient's negligence and the injury caused by the physician. Lambert, supra, at 285. "The contributory negligence of the patient must have been an active and efficient contributing cause of the injury that is the basis of the patient's claim." Viox v. Weinberg, 169 Ohio App.3d 79, 2006-Ohio-5075,861 N.E.2d 909, ¶ 13. Medical experts must testify that the proximate effect of patient's negligence aggravated the relevant medical condition.Lambert, at 285.
 {¶ 71} In the case at bar, the trial court did not abuse its discretion in refusing to instruct the jury on Mr. Mullins' alleged contributory negligence. Both Dr. McDaniel and Dr. Salsitz testified that the small amount of Nordiazepam in Mr. Mullins' bloodstream could have been a by-product of the final dose of Librium that Mr. Mullins took prior to his appointment with Dr. Economus. Dr. Salsitz asserted that, had Dr. McDaniel tested Mr. Mullins' liver function, he could have determined whether Mr. Mullins' capacity to metabolize drugs had been adversely affected by his alcohol abuse.
 {¶ 72} The only contrary claim before the court was the speculation by Dr. McDaniel that Mr. Mullins could have taken any number of Benzodiazepines after his appointment with him. There was no evidence before the court, however, to substantiate Dr. McDaniel's theory. *Page 22 
 {¶ 73} Accordingly, the trial court did not abuse its discretion in refusing to give a comparative negligence instruction with respect to Mr. Mullins. As a consequence, Appellants' first assignment of error, as it applies to Mr. Mullins, is overruled.
 {¶ 74} Next, Appellants argue that the trial court should have instructed the jury as to Appellee's alleged contributory negligence. Appellee contends that she could not have been found liable for Mr. Mullins' death because she was not made a party to the lawsuit, and because she owed no duty of care to Mr. Mullins.
 {¶ 75} Ohio courts describe the tort of negligence as consisting of three elements: duty, breach of duty, and injury proximately caused by the breach of duty. See Littleton v. Good Samaritan Hosp. HealthCtr. (1988), 39 Ohio St.3d 86, 92, 529 N.E.2d 449, 454-455. Whether there exists a duty for purposes of a negligence action is a question of law for the court. Mussivand v. David (1989), 45 Ohio St.3d 314, 318,544 N.E.2d 265, 269-270.
 {¶ 76} The general rule is that a person owes no duty to act for the protection of others: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement of the Law 2d, Torts (1965), Section 314.
 {¶ 77} One exception to the general rule of nonliability for the acts of third parties is that an actor owes a duty to exercise reasonable care to protect those for whom the actor has voluntarily undertaken a duty to protect. Section 323(b) of the Restatement reads, "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection *Page 23 
of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." See also, Kerr-Morris v.Equitable Real Estate Invest. Mgt., Inc. (1999), 136 Ohio App.3d 331,335, 736 N.E.2d 552.
 {¶ 78} In other words, "[a] voluntary act, gratuitously undertaken must be * * * performed with the exercise of due care under the circumstances." Briere v. Lathrop Co. (1970), 22 Ohio St.2d 166, 172,258 N.E.2d 597. "This type of negligence follows the general rules for finding negligence, with the addition of one extra element of proof, that of reasonable reliance by the plaintiff on the actions of the defendant." Douglass v. Salem Community Hospital, 153 Ohio App.3d 350,2003-Ohio-4006, 794 N.E.2d 107, ¶ 74.
 {¶ 79} Here, Appellee accepted responsibility to oversee Mr. Mullins' outpatient treatment. (Trial Tr., p. 182.) If the jury found that: (1) Appellee disregarded Dr. McDaniel's instructions to take Mr. Mullins to the hospital if she could not arouse him by 7:00 p.m.; and (2) Mr. Mullins would have survived if Appellee followed Dr. McDaniel's instructions, the jury may also have found that her failure to act was a proximate cause of Mr. Mullins' death.
 {¶ 80} There is no colloquy in the trial transcript that explains the trial court's refusal to instruct the jury on contributory negligence. As a consequence, we must assume that the trial judge credited Appellee's version of the facts over Dr. *Page 24 
McDaniel's version. Because the contributory negligence issue in this case turns exclusively on conflicting testimony, the trial court's usurpation of the role of the factfinder was both unreasonable and arbitrary.
 {¶ 81} Furthermore, without a contributory negligence instruction, the jury could not understand the proper evidentiary weight to give to Appellee's failure to take Mr. Mullins to the hospital at 7:00 p.m. Even if they believed Dr. McDaniel's story, they may not have understood that they could find that both parties were negligent. As a consequence, the trial court abused its discretion in refusing to instruct the jury on Appellee's alleged contributory negligence.
 {¶ 82} Having concluded that a contributory negligence instruction would have been appropriate based upon the facts adduced at trial, we turn to Appellee's argument that she was not a party to the action. At oral argument, Appellee's counsel asserted that although Appellee was a named party, she was named solely as administratrix of the estate. Therefore, she was only a nominal party. However, because Appellee is also one of Mr. Mullins' beneficiaries, she is a real party in interest.
 {¶ 83} Pursuant to Ohio's wrongful death statute, Mr. Mullins' beneficiaries are the real parties in interest. Burwell v. Maynard
(1970), 21 Ohio St.2d 108, 110, 255 N.E.2d 628. Because the statutory beneficiaries are the real parties in interest to a wrongful death action, the Supreme Court of Ohio has consistently held that they are subject to principles of res judicata, amenable to claims of contributory negligence, and are bound by a general release. Id. at 111,255 N.E.2d 628. *Page 25 
 {¶ 84} In a wrongful death action, "the contributory negligence of the plaintiff is available as a defense against those beneficiaries whose negligence contributed to the death of the deceased, but not against those who were free from negligence." Shinaver v. Szymanski (1984),14 Ohio St.3d 51, 55, 471 N.E.2d 477. The contributory negligence of Appellee, who is a real party in interest by virtue of her status as a beneficiary, "is a partial defense only as to [her] share of the right to recovery of damages, but does not constitute a defense to the right of [other beneficiaries] to recover damages." Id. at 56. "The issue of the contributory negligence of the plaintiff in the wrongful death action * * * must be submitted to the jury pursuant to the comparative negligence provisions of R.C. 2315.19(A)(1)." Id.
 {¶ 85} Because Appellee was never joined as a party defendant, she cannot be found liable to the estate. However, Appellants' failure to join her as a party defendant does not prevent the reduction of her right to recover damages as a beneficiary to the extent that the jury finds her to be a proximate cause of Mr. Mullins' death.
 {¶ 86} Accordingly, Appellants' first assignment of error, as it applies to Appellee's alleged negligence, is sustained in part.
 Second Assignment of Error {¶ 87} "The trial court abused its discretion by denying Appellants' Motion for New Trial."
 {¶ 88} Appellants' motion for new trial, which was based upon the trial court's failure to instruct the jury on comparative negligence, is premised upon *Page 26 
Civ. R. 59(A)(7) and (9). Civ. R. 59(A)(7) allows a judge to grant a new trial if "[t]he judgment is contrary to law." When a party claims that a judgment is contrary to law pursuant to Civ. R. 59(A)(7), the question presented is one of law which requires a review of facts and evidence, but does not involve a consideration of the weight of the evidence or credibility of the witnesses. See Pangle v. Joyce (1996), 76 Ohio St.3d 389, 391,667 N.E.2d 1202, citing O'Day v. Webb (1972), 29 Ohio St.2d 215,280 N.E.2d 896, paragraph two of the syllabus. Thus, a court reviewing a trial court's decision regarding a Civ. R. 59(A)(7) new trial motion must determine whether the judge erred as a matter of law. SeeO'Day, at paragraph one of the syllabus; Pangle, at 391.
 {¶ 89} Civ. R. 59(A)(9) provides that the trial court may grant a new trial based upon, "[e]rror of law occurring at the trial and brought to the attention of the trial court." Like motions for new trial premised upon 59(A)(7), review of a motion pursuant to 59(A)(9) is de novo, rather than under an abuse-of-discretion standard. Ferguson v. Dyer
(2002),149 Ohio App.3d 380, 383, 777 N.E.2d 850, 852, citing Rohde v.Farmer (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685, paragraph two of the syllabus. The trial court may only grant a new trial pursuant to Civ. R. 59(A)(9) if the challenged action was both legally erroneous and prejudicial. Sinea v. Denman Tire Corp. (1996),135 Ohio App.3d 44, 65, 732 N.E.2d 1033; Sanders v. Mt. Sinai Hosp.
(1985), 21 Ohio App.3d 249, 252, 487 N.E.2d 588.
 {¶ 90} In the case at bar, the issue of Appellee's alleged contributory negligence turns on a credibility determination: Did Dr. McDaniel instruct Appellee to *Page 27 
take Mr. Mullins to the hospital at 7:00 p.m. if she could not awaken him? If the jurors answer "yes" to this question, they may conclude that Appellee's decision to ignore Dr. McDaniel's orders was a proximate cause of Mr. Mullins' death. "The issue of whether the contributory negligence of a beneficiary is the proximate cause of the wrongful death must be submitted to the jury pursuant to the comparative negligence provisions of R.C. 2315.19(A)(1)." Shinaver, 14 Ohio St.3d 51,471 N.E.2d 477, at paragraph 3 of the syllabus. Accordingly, the trial court's refusal to instruct the jury on the issue of Appellee's alleged contributory negligence was contrary to law.
 {¶ 91} Furthermore, a finding of contributory negligence would have reduced the money judgment against Appellants. Because Appellee's right to a recovery of damages would have been reduced commensurately with her negligence pursuant to the comparative negligence statute, Appellants were prejudiced by the trial court's refusal to instruct the jury on Appellee's alleged contributory negligence. Therefore, Appellants' second assignment of error is sustained.
 Third Assignment of Error {¶ 92} "The trial court abused its discretion by excluding Appellants' original expert, Dr. Theodore Parran."
 {¶ 93} The trial court granted Appellee's motion to disqualify Appellant's expert, Dr. Theodore Parran, because Appellee's counsel had previously engaged in confidential communications with him in order to retain him as an expert witness in this case. According to the affidavit of Appellee's counsel, he contacted Dr. Parran in February, 2004, and discussed his work product and his theories of liability of the *Page 28 
case with him. According to Appellee's counsel, Dr. Parran reviewed the matter and used counsel's work product in his analysis of the case, but ultimately declined to serve as Appellee's expert.
 {¶ 94} Dr. Parran claimed that he had no recollection of any communication with Appellee's counsel about this case. In his affidavit, Dr. Parran stated, "[a]ny conversations with [Appellee's counsel], if they actually occurred, had absolutely no impact on my opinions in this case, nor will they impact my future involvement as an expert witness on behalf of Dr. McDaniel and his professional corporation." (Parran Aff. at ¶ 6.)
 {¶ 95} Although no Ohio court has specifically addressed the disqualification of an expert where the expert has previously engaged in confidential communications about the case with opposing counsel, several federal courts have fashioned a two-part test to determine whether disqualification is proper. Disqualification of an expert is warranted based upon a prior relationship with an adversary if: (1) the adversary had a confidential relationship with the expert; and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation. Hewlitt-Packard Co. v. EMCCorp., 330 F.Supp.2d 1087, 1092-1093 (N.D. Cal. 2004); Wang Labs., Inc.v. Toshiba Corp. 762 F.Supp. 1246, 1248 (E.D. Va. 1991). In applying the test, courts must consider fundamental fairness and prejudice to the non-moving party. Hewlitt-Packard Co., at 1094. The purpose behind the power to disqualify is two-fold; first, to protect the various privileges that may be breached if an expert is permitted to change sides during litigation, and second, to preserve the public *Page 29 
confidence in the fairness and integrity of the judicial proceedings.Paul v. Rawlings Sporting Goods Company, 123 F.R.D. 271, 277-278 (1988).
 {¶ 96} The party seeking disqualification bears the burden of demonstrating that a confidential relationship existed such that an exclusion is warranted. Hewlett-Packard Co., supra at 1093. "[T]he party requesting disqualification may not meet its burden with `mere conclusory or ipse dixit assertions.'" Greene, Tweed of Delaware, Inc.v. Dupont Dow Elastomers, L.L.C., 202 F.R.D. 426, 429 (E.D.Pa. 2001). (Internal citation omitted.) Disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely, especially if disqualification is likely to disrupt the judicial proceedings. Hewlett-Packard Co., at 1093-1095.
 {¶ 97} Here, Appellee's counsel stated that he shared his work product and his theories of liability with Dr. Parran. Dr. Parran does not deny that those conversations occurred. Instead, he claims that he does not remember them.
 {¶ 98} The danger in permitting an expert to testify on behalf of Appellants, where the expert engaged in confidential communications about the case with Appellee for the purpose of being retained as an expert by Appellee is obvious. Moreover, the expert's claim that he had no recollection of his confidential conversations with Appellee's counsel provides virtually no protection to Appellee's reasonable expectation that the substance of her confidential conversations would be used to her detriment in this case. Despite Dr. Parran's faulty memory, the possibility that some part of the trial preparation would stimulate his memory is a sufficient reason to disqualify him from the case. *Page 30 
 {¶ 99} Of equal import, Appellants were not prejudiced by the disqualification of Dr. Parran. The trial was continued and Appellants were provided a sufficient extension of time to find another expert. Appellants ultimately secured the services of Dr. Parran's co-director of the Rosary Hall Treatment Center, Dr. Christopher Adelman. As such, Appellants' third assignment of error is overruled.
 Fourth Assignment of Error {¶ 100} "The trial court abused its discretion by granting Appellee's Motion for Prejudgment Interest."
 {¶ 101} Because we have agreed with Appellants' arguments as to the error in the jury instructions and are remanding the matter to the trial court for a new trial on this issue, the matter of prejudgment interest has become moot on appeal. Huffman v. Hair Surgeon, Inc. (1985),19 Ohio St.3d 83, 84, 482 N.E.2d 1248.
 {¶ 102} In summary, Appellants' motion for new trial should have been granted. The trial court abused its discretion and prejudiced Appellants, as well as erred as a matter of law when it refused to provide a comparative negligence instruction with respect to Appellee. Although the record contains only speculation regarding Mr. Mullins' alleged contributory negligence, the conflicting testimony provided by Dr. McDaniel and Appellee creates an, "actual issue[ ] in the case as posited by the evidence." Guster, 66 Ohio St.2d at 271, 614 N.E.2d 748. The trial court did not abuse its discretion, however, when it excluded Dr. Parran as Appellants' expert. Appellee's counsel shared information about the case with Dr. Parran, including his own work product and theories of liability in an effort to secure *Page 31 
Dr. Parran's services as an expert witness. Based on our decision in this regard, Appellants' arguments as to prejudgment interest are moot. Because we have sustained Appellants' first assignment of error in part and their second assignment of error in full, we hereby remand this matter to the trial court for further proceedings according to law and consistent with this Opinion.
Vukovich, P.J., concurs.
DeGenaro, J., concurs. *Page 1